**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| RIDE, INC. and RUSSELL D. IDE, | : | |
| Plaintiffs, | : | CIVIL ACTION NO. |
| | : | 3:11-CV-1721 (JCH) |
| v. | : | |
| | : | |
| APS TECHNOLOGY, INC. and WILLIAM | : | MARCH 31, 2014 |
| E. TURNER, | : | |
| Defendants. | : | |

**RULING RE: PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. No. 85) AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. No. 87)**

## I.    INTRODUCTION

In this diversity action, plaintiffs Russell D. Ide ("Ide") and RIDE, Inc. ("RIDE"), in their Third Amended Complaint ("TAC") (Doc. No. 35), allege seven claims arising out of a 1994 agreement and an alleged joint venture with the defendants, APS Technology, Inc. ("APS") and William E. Turner ("Turner").  The plaintiffs set forth claims of breach of written contract, breach of oral contract, breach of implied covenant of good faith and fair dealing, breach of fiduciary duty, accounting, unjust enrichment, and CUTPA.  TAC at 10-18.  Defendants filed the same seven claims as counterclaims against plaintiffs in their answer to the plaintiffs' Third Amended Complaint.  Answer (Doc. No. 38) at 13-19.

The plaintiffs have moved for summary judgment on all of the defendants' cross-claims.  Plaintiffs' Motion for Partial Summary Judgment ("Pls.' Mot. Summ. J.") (Doc. No. 85).  Defendants do not object to the plaintiffs' Motion, thus abandoning all of their counterclaims.[1]  Defendants' Response Memorandum to Plaintiffs['] Motion for Partial

---

[1] See Defendants' Response Memorandum to Plaintiffs Motion for Partial Summary Judgment (Doc. No. 101) at 2 ("Defendants are content to not oppose the present motion and instead respectfully focus the Court's attention upon the various actions of Plaintiffs that are wholly inconsistent with their claims to have had an agreement with APS to share profits on

Summary Judgment (Doc. No. 110) at 2.  Therefore, the plaintiffs' Motion for Partial Summary Judgment is **GRANTED**.  The defendants move for summary judgment on all of plaintiffs' claims.  For reasons set forth below, the court **GRANTS** the defendants' Motion for Summary Judgment on All Counts ("Defs.' Mot. Summ. J.") (Doc. No. 87).

## II.    STANDARD OF REVIEW

A motion for summary judgment may be granted only when there are no issues of material fact in dispute and the moving party is therefore entitled to judgment as a matter of law.  See Fed. R. Civ. P. Rule 56(a); In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009).  The moving party may satisfy his burden "by showing—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (quotation marks and citations omitted).  Once the moving party meets this burden, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). The non-moving party must present evidence that would allow a reasonable jury to find in its favor in order to defeat the motion for summary judgment.  Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

When reviewing the record, the court resolves all ambiguities and draws all permissible factual inferences in favor of the party against whom summary judgment is sought.  Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).  If there is any evidence in the record on a material issue from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is inappropriate.

---

sales of all suspensions and isolators as evidence that those claims are meritless rather than as independent grounds for counterclaims.").

Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004). However, the existence of a mere "scintilla" of evidence supporting the plaintiff's position is insufficient to defeat a motion for summary judgment. Harvey v. Homebound Mortgage, Inc., 547 F.3d 158, 163 (2d Cir. 2008).

## III.    STATEMENT OF FACTS[2]

### A.    The 1994 Agreement

A two-page letter agreement (the "1994 Agreement") was executed on May 27, 1994, by Turner, on behalf of APS, and on June 3, 1994, by Ide, on behalf of RIDE. Defendants' Local Rule 56(a)1 Statement ("Defs.' L.R. 56(a)1 Stmt.") (Doc. No. 93-1[3]) at ¶ 1; Plaintiffs' Local Rule 56(a)2 Statement ("Pls.' L.R. 56(a)2 Stmt.") (Doc. No. 97-1[4]) at ¶ 1. The 1994 Agreement purports to "set forth [the parties'] understanding and agreement as to the development of [their] mutual business interest in developing technical products for the oilfield and other industries." Defs.' Ex. A at 1. The 1994 Agreement further specifies that: "[t]he products agreed upon are flexible couplings, sealed bearings, flow restrictors, and deflection pad silicon carbide bearings including any product covered by patents 5,048,981; 5,135,060; 5,007,490; 5,048,622; 5,077,491;

---

[2] Unless otherwise noted, the parties have indicated that these facts are undisputed, either in their Statement of Undisputed Facts that accompanied their Rule 26(f) Report ("R. 26(f) Stmt. Undisp. Facts") (Doc. No. 29) or by statements in their respective Local Rule 56(a) filings (Doc. Nos. 93-1 and 97-1).

[3] Citations are to the defendants' redacted and corrected Local Rule 56(a)(1) Statement (Doc. No. 93-1). The unredacted version of defendants' Local Rule 56(a)(1) Statement can be found at docket entry 96-1.

[4] Citations are to the plaintiffs' redacted Local Rule 56(a)(2) statement (Doc. No. 97-1). The sealed versions of the plaintiffs' Memorandum of Law Opposing Summary Judgment (Doc. No. 98) and the Local Rule 56(a)(2) Statement (Doc. No. 98-1) have been manually filed.

and other patents such as the threaded, rubber injected flex coupling and the spiral groove flow restrictor."[5]  Defs.' Ex. A at ¶ 1.

The 1994 Agreement set forth two phases: Phase One, which was to continue for one year or until $250,000 annualized sales was reached; and Phase Two, which would commence after Phase One was complete.  Defs.' L.R. 56(a)1 Stmt. at ¶ 3; Pls.' L.R. 56(a)2 Stmt. at § I, ¶ 3; Defs.' Ex. A at ¶ 3.  The 1994 Agreement provided that:

> During Phase One RIDE will grant to APS Technology exclusive rights to market and distribute the above products. APS Technology will deal exclusively with RIDE for engineering and manufacturing the above products. APS Technology will pay 90% of the sales receipts to RIDE and APS Technology will retain 10% of the sales receipts. RIDE will absorb all of the manufacturing and engineering costs. APS Technology will absorb all of the marketing and sales cost.

Defs.' Ex. A at ¶ 5.  The 1994 Agreement noted that, "[d]uring Phase Two a joint venture will be established to design, manufacture, market, and distribute the above products.  The joint venture will be owned 50% by RIDE and 50% by APS Technology." Id. at ¶ 6.  The Agreement's termination clause stated that, "[e]ither party may terminate this agreement if, after 12 months no prototypes are developed, or if after 2 years no sales are generated."  Id. at ¶ 7.

From 1996 through 2009, RIDE and APS shared certain, but not all, costs and proceeds from the sales of the Baker Hughes INTEQ suspension/isolator (heretofore referred to by the court as the "RIDE Product") on a 50/50 basis.  See Rule 26(f) Statement of Undisputed Facts ("R. 26(f) Stmt. Undisp. Facts") (Doc. No. 29) at § IV, ¶

---

[5] The following terms do not appear in the Agreement: "suspension," "isolator," "gross profits," "50/50 share," and "the RIDE Product."  Defendants' Local Rule 56(a)1 Statement ("Defs.' L.R. 56(a)1 Stmt.") (Doc. No. 93-1) at ¶ 5; Plaintiffs' Local Rule 56(a)2 Statement ("Pls.' L.R. 56(a)2 Stmt.") (Doc. No. 97-1) at § I, ¶ 5.

8.  In or about 2009, sales of the RIDE Product ended.  R. 26(f) Stmt. Undisp. Facts at §

IV, ¶ 11.

      B.    <u>The 1997 Letter</u>

On August 16, 1997, Ide wrote Turner a two-page letter that stated, in part:

> Ride, Inc. has over 12 patents that relate to oil well drilling. . . . Our [1994]
> agreement states that we would pay APS Technology a 10% commission
> on the sale of products relating to this technology and that when sales
> reached $250,000 we would form a 50/50 joint venture that would focus
> and grow from the earlier successes. As a sign of "good faith" we began
> evenly splitting the gross profits prior to the $250,000 sales target in the
> expectation a joint venture would be formed. . . . Despite these good faith
> efforts, the joint venture has not been formed. To the contrary your APS
> Technology has assumed the role of the joint venture company and is
> capitalizing on our good faith efforts. . . . We believe you have breached
> our written and verbal agreements. . . . Specific areas of concern that
> require immediate remedy include:
>
> - APS Technology has copied our designs without authorization and are
>   misrepresenting them to customers as being APS property. These
>   drawings should be destroyed and any third party notified that they
>   belong to Ride, Inc. . . .
>
> - APS is required to refund the 50% gross profits paid to APS in "good
>   faith" towards formation of the joint venture. We believe our obligation
>   should be limited to a 10% sales commission. Extension of sales that
>   are the direct result of our earlier efforts should be terminated.
>   Specifically, these include the sale of retrofit kits that mate with Ride,
>   Inc. products. APS used our designs to develop these products, have
>   failed to compensate Ride in any way while we continued to share
>   profits. Gross profits from these products should be refunded to Ride
>   less a 10% commission paid to APS. . . ..
>
> We intend to pursue all legal and injunctive means available to resolve
> these issues. Any further contact or activity with Ride, Inc. vendors,
> customers and proprietary/patented information should be terminated
> immediately.

Defs.' Ex. I at 1-2; <u>see</u> <u>also</u> Defs.' L.R. 56(a)1 Stmt. at ¶¶ 12-13; Pls.' L.R. 56(a)2 Stmt.

at § I, ¶¶ 12-13.

C.     The '541 Patent

In 1996, Turner and Ide agreed to apply for a patent disclosing a tapered isolator for drill strings (the "'541 patent"). R. 26(f) Stmt. Undisp. Facts at § IV, ¶ 12; Pls.' L.R. 56(a)2 Stmt. at § I, ¶ 22. On December 28, 1996, Ide signed a statement for the '541 application which stated: "I have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment referred to above." Defs.' Ex. DD at 3; Defs.' L.R. 56(a)1 Stmt. at ¶ 30; Pls.' L.R. 56(a)2 Stmt. at § I, ¶ 30. Ide appointed Michael D. Bednarek to prosecute this application. Pls.' L.R. 56(a)2 Stmt. at § I, ¶ 32; see also Defs.' Ex. DD at 3.

The '541 patent issued on November 10, 1998. Defs.' Ex. EE at 1. Mr. Bednarek, Ide's patent lawyer of many years, received notice that the patent had issued, as evidenced by a letter sent from Mr. Bednarek to Turner on December 3, 1998. Defs.' L.R. 56(a)1 Stmt. at ¶ 33; Pls.' L.R. 56(a)2 Stmt. at § I, ¶ 33; Defs.' Ex. EE at 1. On June 26, 2006, Bednarek emailed Ide and attached a report listing the status of patents in Ide's name and that the attached report included a list of 70 patents, one of which was the '541 patent. Pls.' L.R. 56(a)2 Stmt. at § I, ¶ 34; see also Defs.' Ex. FF. at 3-4. The same report sent to Ide also contained information on reassignment of the '541 patent, which indicated that William Turner assigned the '541 patent (1) to Liberty Bank in Middletown, Connecticut on June 1, 1998, for a "Mortgage, Assignment and Security Agreement," and (2) to the Connecticut Development Authority in Rocky Hill, Connecticut on May 19, 2000, for a "Mortgage and Security Agreement." See Defs.' Ex. FF at 4.

IV.    **DISCUSSION**[6]

    A.    <u>Breach of Written and Oral Contract Claims</u>

In their Third Amended Complaint, plaintiffs allege that they performed their obligations, TAC at ¶¶ 90, 96, but the defendants breached the 1994 Agreement or, alternatively, the parties' oral agreement, "by failing to share with RIDE the gross profits (1) made on sales of the APS Product and Isolation Sub and (2) attributable to the inclusion in other APS products of suspensions and/or isolators that contain a metal/rubber helix." <u>Id.</u> at ¶ 91; <u>see</u> <u>also</u> <u>id.</u> at ¶ 97.[7]  For the breach of oral contract claim, the plaintiffs claim that, "[e]ven aside from the 1994 Agreement, the existence of a joint venture agreement is evidenced by many documents exchanged between the parties as well as a course of dealing lasting more than a decade, during which the parties shared gross profits earned on the RIDE Product equally." <u>Id.</u> at ¶ 94.  Plaintiffs argue that the parties' splitting of gross profits on sales of the RIDE Product strongly supports the inference that:

> (1) the 1994 Agreement's reference to 'flexible couplings' covers suspensions that incorporate the metal/rubber helix concept adapted from Ide's Flex Coupling design, including those sold by APS (collectively, the "APS Product"); and[,] (2) although the parties never formally created a separate joint venture entity (such as a corporation or LLC), the parties reached the joint venture stage (i.e., Phase Two) of the 1994 Agreement.

---

[6] While the parties do not raise a choice of law issue in their memoranda, they primarily cite to Connecticut cases.  Turner is a resident of, and APS conducts business in, Connecticut. TAC at ¶¶ 3-4.  In the absence of any dispute on this issue, the court will generally look to Connecticut law.

[7] There are two slight differences between the plaintiffs' description of defendants' alleged breaches for their oral and written contract claims: (1) the plaintiffs chose the word "Plaintiffs" in paragraph 97 for the oral contract description of breach, as compared to "RIDE" in paragraph 91, and (2) the plaintiffs removed the phrase "under the 1994 Agreement," which appears in paragraph 91 from their description of defendants' breach of the oral contract under paragraph 97.  Given the similarity between the alleged breaches, they will be addressed together.

Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary

Judgment on All Counts ("Pls.' Opp.") (Doc. No. 97) at 2.

        1.     Applicable Law

            a.     Formation and Breach of Contract

"[A]n agreement must be definite and certain as to its terms and requirements

. . . .  So long as any essential matters are left open for further consideration, the

contract is not complete." L & R Realty v. Conn. Nat'l Bank, 53 Conn. App. 524, 535

(1999) (quotations marks and citations omitted).  While all the terms of a contract do not

need to be present, all the essential terms must have been agreed on.  Aruba Hotel

Enters. N.V. v. Belfonti, 611 F. Supp. 2d 203, 209 (D. Conn. 2009) (citing Glazer v.

Dress Barn, Inc., 274 Conn. 33, 53 (2005)).  "[A]n agreement to agree does not give rise

to a contractual relationship." Realty Res. Chartered v. The HB Nitkin Grp., No.

3:08CV586, 2009 WL 2243695, at *7 (D. Conn. July 24, 2009) (citations omitted).

To modify an agreement, "there must be mutual assent to the meaning and

conditions of the modification and the parties must assent to the same thing in the same

sense if they are to vary the contract in any way." Lar–Rob Bus Corp. v. Town of

Fairfield, 170 Conn. 397, 402 (1976) (quotes and citations omitted); see also First

Hartford Realty Corp. v. Ellis, 181 Conn. 25, 33 (1980).  "An existing contract may be

modified or abrogated by a new contract arising by implication from the conduct of the

parties." Malone v. Santora, 135 Conn. 286, 292 (1949) (citation omitted).

To show a breach of contract under Connecticut law, RIDE must establish the

following: (1) the parties formed an agreement, (2) RIDE performed on the agreement,

(3) APS breached the agreement, and (4) APS's breach was the direct and proximate

cause of RIDE's (5) damages.  See McCann Real Equities Series XXII, LLC v. David

McDermott Chevrolet, Inc., 93 Conn. App. 486, 503-04 (2006).

b.     Formation of a Joint Venture

"A joint venture is a special combination of two or more persons who combine

their property, money, effects, skill, and knowledge to seek a profit jointly in a single

business enterprise without any actual partnership or corporate designation." Elec.

Assocs., Inc. v. Automatic Equip. Dev. Corp., 185 Conn. 31, 35 (1981). Under

Connecticut law, there are five elements that constitute a joint venture, namely:

> (1) [T]wo or more persons must enter into a specific agreement to carry on
> an enterprise for profit, (2) an agreement must evidence their intent to be
> joint venturers, (3) each must contribute property, financing, skill,
> knowledge or effort, (4) each must have some degree of joint control over
> the venture, and (5) there must be a provision for the sharing of both
> profits and losses.

Censor v. ASC Techs. of Conn., LLC, 900 F. Supp. 2d 181, 201 (D. Conn. 2012); see

also Schlierf v. Abercrombie & Kent, Inc., No. X02CV055003467, 2011 WL 2418571, at

*6 (2011) ("A joint venture requires five elements.") (quotation marks and citation

omitted).

While a joint venture need not be a separate legal entity with a separate legal

existence, Inv. Assocs. v. Summit Assocs., Inc., 309 Conn. 840, 860 n.12 (2013), "[t]he

relationship between contracting parties cannot amount to a joint venture unless the

parties so intend." Elec. Assoc., 185 Conn. at 35; see also Doe v. Yale Univ., 252

Conn. 641, 672-73 (2000).  Joint ventures are formed for a limited purpose rather than

as an ongoing enterprise.  See Dolan v. Dolan, 107 Conn. 342, 349 (1928).

An agreement to share profits alone does not constitute a joint venture.  See

Wicks v. Knorr, 155 A. 816, 817 (Conn. 1931).  Likewise, the mere sharing of an

9

economic interest is not sufficient to form a joint venture, since there must be some evidence that the parties participate and have control over the enterprise." R. S. Silver Enterprises Co., Inc. v. Pascarella, 2010 WL 3259869 at *28 (Conn. Super. Ct. July 14, 2010) (quotation marks and citation omitted).  "[M]any companies seek to cooperate with each other and reach agreements to implement such cooperation.  However, most of these agreements do not create joint ventures.  A joint venture represents more than 'a simple contractual relationship.'" USAirways Grp., Inc. v. British Airways PLC, 989 F. Supp. 482, 493 (S.D.N.Y. 1997) (citation omitted).[8]

> 2.     Application

Defendants assert that RIDE's claims of breach of written and oral contract fail as a matter of law. Defendants argues that the plain language of the 1994 Agreement and the plaintiffs' conduct show that the parties never intended for the 1994 Agreement to cover the APS Product.  Further, defendants argue that Phase Two, as outlined in the Agreement, did not occur because the joint venture was never formed.  See Defendants' Memorandum of Law in Support of its Motion for Summary Judgment on All Counts (Doc. No. 87-1) ("Defs.' Mem.") at 4-5, 8.

Plaintiffs acknowledge that the 50/50 profit-sharing arrangement was "a departure from the original plan to establish a separate joint venture company," Pls.'

---

[8] New York case law is instructive here, as Connecticut and New York law use the same test to determine whether a joint venture exists.  See SCS Commc'ns., Inc. v. Herrick Co., Inc, 360 F.3d 329, 341 (2d Cir. 2004) (citing Itel Containers Int'l Corp. v. Atlanttrafik Express Serv., Ltd., 909 F.2d 698, 701 (2d Cir.1990)) (applying the Censor test).  Courts have observed the similarity between New York and Connecticut law pertaining to the formation of joint ventures. See Censor, 900 F. Supp. 2d at 201 (concluding that the Second Circuit's affirmation of the New York joint venture test is controlling precedent for the District of Connecticut); see also Weston Chemical, Inc. v. Diamond Fertiliser & Chemical Corp., 1990 WL 128235 at *7 (D. Conn. July 2, 1990) (stating that "the question of which law to apply is academic given the similarity of Connecticut and New York law regarding what constitutes a joint venture.").

Opp. at 7, but argue that the "50/50 profit-sharing arrangement was consistent with the joint venture contemplated by Phase Two of the 1994 Agreement."  Pls.' L.R. 56(a)2 Stmt. at § II, ¶ 34.  Plaintiffs classify the 50/50 sharing of gross profits for the RIDE Product—over a period of 15 years—to be "[t]he most tangible evidence that the parties did establish a joint venture."  Pls.' Opp. at 10.

The plain language of the 1994 Agreement does not contemplate a sharing of 50/50 gross profits of the RIDE Product, defined by the plaintiffs as "revenues minus out-of-pocket manufacturing costs but not allocated overhead."  Pls.' L.R. 56(a)2 Stmt. at § II, ¶ 33.  Rather, Phase Two of the 1994 Agreement contemplates a joint venture "owned 50% by RIDE and 50% by APS" which will "design, manufacture, market, and distribute the [¶ 1] products."  Defs.' Ex. A at ¶ 6.  Phase One of the 1994 Agreement provides that RIDE will receive 90% of the sales receipts and APS will retain 10% of the sales receipts, with RIDE "absorb[ing] all of the manufacturing and engineering costs."  Id. at ¶ 5.  The plaintiffs' primary basis for asserting that a joint venture exists between the parties is that the parties shared, on a 50/50 gross profits basis, proceeds from the RIDE Product; likewise, the plaintiffs argue that the defendants breached this joint venture by not paying them 50% of the gross profits from sales of the APS Product.  See TAC at ¶¶ 82, 91, 94, 95, 97; Pls.' L.R. 56(a)2 Stmt. at § II ¶ 34.  Neither of these bases rest upon the plain language of the 1994 Agreement alone and, as such, additional evidence regarding the terms of the parties' sharing of 50/50 gross profits, which is the essence of the joint venture as articulated by the plaintiffs, would be necessary for a jury to find a joint venture.

The only evidence offered to clarify how the 50/50 gross profits arrangement initially developed is found in Ide's deposition testimony, which describes the meeting where he and William Turner ("Bill," below) discussed the change from a 90/10 sharing of "sales receipts" to a 50/50 sharing of "gross profits":

> Q.    Who approached whom about changing the division of sales revenues under the 1994 Agreement from 90/10 to 50/50?
>
> A.    Bill.
>
> Q.    Bill approached you?
>
> A.    Oh, yeah.
>
> Q.    Okay. When did that occur?
>
> A.    Fairly soon after the initial order.  When it looked as though it was going to build. I think when we got our first production order, he, in effect, recommended or asked that we do it.

Pls.' Ex. 30 ("Mar. 20 Ide Depo.") at 33:8-33:19.

Later, in the August 16, 1997 letter from Ide to Turner, Ide characterizes the act of sharing 50/50 gross profits with APS to be "a sign of 'good faith,'" and, after listing additional costs that RIDE invested for design, engineering and development, concludes that, "[d]espite these good faith efforts, the joint venture has not been formed."  Defs.' Ex. I at 1.  The 1997 Letter goes on to state that, "Ride has made available to APS all of its' [sic] proprietary and patented information in the spirit of 'good faith,' cooperation and the intent of forming a joint venture company," and that "APS has failed to honor its obligations; has used Ride, Inc. property to its own benefit and is misrepresenting itself to customers and vendors."  Id. at 2.  RIDE then makes a demand of APS to "refund the 50% gross profits paid to APS in "good faith" towards formation of the joint venture."  Id.

at 2.  In his deposition testimony, Ide discusses his thoughts at the time of the 1997

letter:

> Q.    So you understood as of August 16, 1997 that the joint venture
>        that's referenced in the 1994 letter agreement had not been
>        formed. Is that correct?
>
> A.    But what I was saying is that what was—we were considering or
>        contemplating that we would have a joint venture company which
>        would be a separate entity.  The joint venture that we would both
>        equally fund 50/50 and we'd grow that technology and add to it and
>        build it as a separate company, and that just never happened. We
>        were sharing profits like we were a joint venture company.   We
>        were functioning like a joint venture company.  But we never took
>        the step to form that entity.
>
> Q.    Okay.
>
> A.    It was kind of unsettling at the time.  I mean, we were hoping to
>        build this thing and it was -- just never got there.
>
> Q.    Okay. And why did it never get there?
>
> A.    [Turner] didn't have any money.  You can't form a joint venture if
>        nobody has got any capital to put into a joint venture company.

Mar. 20 Ide Depo. at 157:3-157:25.  After receiving the 1997 Letter, Turner called and

subsequently met with Ide:

> Q.    [The 1997 Letter] indicates that it was sent on August 16, 1997.  Do
>        you know how it was sent?  Was it sent by fax or was it sent by
>        mail? Do you know?
>
> A.    I can't recall.  One of the two.  I know he got it.
>
> Q.    How do you know he got it?
>
> A.    He called up.
>
> Q.    Okay. And what did he say?
>
> A.    He says, you know, we've got a big misunderstanding, we have got
>        to sit down and talk.
>
> Q.    Okay. And did you?

> A.    Yeah.  He came down to the office with a couple of other guys.  We sat down and talked about it, explained that I'm not copying your drawing.  It was a requirement of the customer that we send them a computer-assisted design format of the drawing.  And it's on APS letterhead.  And it was just a misunderstanding.  And, you know, we weren't trying to take your drawings and claim them for our own.
>
> I said, well, that's what you did.  And he said, [w]ell, I'm sorry.  We're not going to do it again.  Let's get back to work and keep it going.  We're a good business, we're both making money on it, so let's continue.

Id. at 146:9-147:11.  Further, plaintiff Ide admits that:

> [a] separate joint venture company was never established, but we functioned as a joint venture partnership, <u>according to the normal terms where we did the manufacturing and marketing</u>.  It was a bone of contention, you know.  I felt we should have formed a joint venture company, but <u>we</u> <u>didn't</u>.

Id. at 69:10-69:16 (emphasis added).  When asked to clarify what he meant by "we functioned as a joint venture," Ide continued:

> [w]ell, we shared everything.  They came down to our plant and, you know, reviewed our drawings, went to our subcontractors.  We shared— we developed the sales and advertising products—I mean, the literature for him to sell.  We worked very, very closely as partners. I mean, that's what we did. . . . We shared all the costs.  We split them 50/50. We shared all the profits 50/50.  Shared all the losses 50/50.  And, yeah, everything was split 50/50 and we shared everything.

Id. at 69:24-70:13.  When queried as to which specific losses they shared 50/50, Ide responded:

> A.    Well, if we had something that was—that was scrapped or, you know, didn't work, we'd have to—you know, we weren't going to pay for it, but we split the cost of it.
>
> Q.    So that you shared costs for everything 50/50?

A.      Yeah.[9] And profits. Gross profits.

Q.      Okay. So my question for you is what losses did you share 50/50?

A.      Well, the cost of scrapped units.

Id. at 70:15-70:24.  Finally, Ide characterizes his relationship with Turner as a

"partners[hip]"[10] and "friends[hip]," rather than "a more formal business arrangement:"

Q.      How about any of the drawings or any – any material you provided
        to Mr. Turner or APS, did any of it have any indication that it was
        proprietary to you or RIDE?

A.      I think some of the drawings had a little—little—[mark] on the block
        which would say this is proprietary property of RIDE, Incorporated.
        But to be quite frank, we were partners.  I mean, anything he
        wanted to see, he came in, he says, can I see this.  Sure, here it is.
        We were partners.  He came in the door and he didn't even have to
        sign in or get a badge or anything else.  He could go wherever he
        wanted to go.  We were partners.  You want me to go up to a
        partner and say, hey, you better sign this nondisclosure agreement
        because I don't trust you, you're going to go do something with it?

        I don't know, maybe in a more formal business arrangement, you
        might.  But, you know, I was pretty good friends with the guy.

Id. at 203:4-203:23.  On May 9, 2011, Ide reiterated the above events, in summary form,

when he emailed Turner after his son had returned from the trade show:

Ride, Inc. designed, engineered, manufactured and shipped metal
elastomer helical couplings/isolators based on our patented intellectual
property . . . and our know how relating to elastomer molds, compression
moldings, etc. APS Technology was responsible for the marketing and the
sales of the units.  While the relationship was initially based on a 10%
representation agreement, it was quickly changed to a 50/50 split of the
gross profits.  The 50/50 split was agreed to in anticipation of forming a
joint venture company which was never formalized.  We did agree on the

---

[9] But see R. 26(f) Stmt. Undisp. Facts at § IV, ¶ 8 (emphasis added) ("From 1996
through 2009, RIDE and APS shared certain but not all costs, as well as proceeds, from the
sales of the Baker Hughes INTEQ suspension/isolator on a 50/50 basis.").

[10] Calling a relationship a "partnership" does not make it one.  See Kosower v. Gutowitz,
No. 00CIV.9011, 2001 WL 1488440, at *6 (S.D.N.Y. Nov. 21, 2001) ("[C]alling an organization a
partnership does not make it one") (citation omitted).

15

partnership for helical elastomer couplings and split the gross profits of millions of dollars over the ensuing years.  This business ceased in 2009 when orders stopped. APS Technology informed us that the customer, Baker Hughes, had stopped using the units and they could not market it elsewhere.  It was surprising to learn that APS Technology was marketing and selling a nearly identical unit without notification to Ride, Inc. while accepting hundreds of thousands of dollars for promoting our own helical coupling.

Defs.' Ex. J at 3.[11]

Taking the evidence in the light most favorable to the plaintiffs, neither the conduct described in the plaintiffs' testimony, nor the sharing of 50/50 gross profits for approximately 15 years on the RIDE Product, created a joint venture under Connecticut law between APS and RIDE, either under the 1994 Agreement or pursuant to an oral agreement.  Where "the parties never reached a mutual understanding about such essential terms as the percentage of ownership, allocation of costs and profits, existence of guarantees, management structure, decision-making responsibility, and

_____

[11] Plaintiffs assert that defendants' Ex. J is inadmissible evidence because it is a "statement[ ] made during compromise negotiations about the claim." Pls.' L.R. 56(a)2 Stmt. at § I, ¶ 14.  While "[t]he general rule that evidence of settlement negotiations is not admissible at trial is based upon the public policy of promoting the settlement of disputes," Jutkowitz v. Department of Health Services, 220 Conn. 86, 97 (1991), "[a]n offsetting principle holds that an admission of fact is competent evidence, even though the admission was made in settlement negotiations, 'where the statement was intended to state a fact.. . . .'" Tomasso Bros., Inc. v. October Twenty-Four, Inc., 221 Conn. 194, 198 (1992) (citation omitted).  "The test is whether the party making the admission intended to concede a fact hypothetically for the purpose of effecting a compromise, or to declare a fact really to exist."  Evans Products Co. v. Clinton Building Supply, Inc., 174 Conn. 512, 517 (1978).

In this email exchange, Ide does ask Turner to "[p]lease advise [him] as soon as possible of [Turner's] comments and/or how we can resolve these issues."  Defs.' Ex. J. However, given that the court finds that the email was written on May 9, 2011, more than five months prior to the filing of the plaintiffs' Complaint on November 7, 2011, and that the language of the email is written in a way that declares facts, rather than hypothetically ponders them in an effort to negotiate a settlement, the court concludes that this email is admissible as a statement of a part opponent, and thus is not hearsay per Federal Rules of Evidence 801(d)(2).

duration of the joint venture," a joint venture agreement cannot be formed.  <u>Realty Res.</u>

<u>Chartered v. The HB Nitkin Grp.</u>, 2009 WL 2243695 at *9 (D. Conn. July 24, 2009).

The parties agree that the joint venture <u>company</u>, as contemplated in the 1994

Agreement, was never formed.  <u>See</u> Pls.' L.R. 56(a)2 Stmt. at § I ¶, 12; Defs.' L.R.

56(a)1 Stmt. at ¶ 12.  The deposition testimony, the documentary evidence, and Ide's

Affidavit ("Ide Aff.") (Pls.' Ex. 28)[12] provide no evidence that it was RIDE's <u>intention</u> to

form an <u>informal</u> joint venture based on the 50/50 splitting of gross profits on the RIDE

Product.  Rather, the evidence plaintiffs present merely states, in a conclusory fashion,

that the parties were functionally operating as a joint venture.  <u>See, e.g.</u>, Mar. 20 Ide

Depo. at 157:3-157:25.

Joint ventures require a manifestation of intent by the parties for them to be

associated as joint ventures: "[t]his manifestation of intent need not be explicit, but the

parties must be clear that they intend to form a joint venture, which is a fiduciary

relationship, and not a simple contract."  <u>Zeising v. Kelly</u>, 152 F.Supp.2d 335, 348

(S.D.N.Y. 2001) (an agreement manifesting the intent of the parties to form a joint

venture "is crucial because a joint venture is a voluntary relationship, the origin of which

---

[12] Ide's Affidavit is notable for its lack of attestation to facts that are critical to the
determination of a joint venture between the parties.  Indeed, the only portions that address
interactions between Turner/APS and Ide/RIDE state: (1) "while sales of the RIDE Product to
Baker Hughes were ongoing, from approximately 1996 through 2009 (and especially in the early
2000s), I would regularly ask Mr. Turner whether APS had identified other potential customers
for the metal/rubber helix design. Mr. Turner was adamant that APS had made every effort to
sell the metal/rubber helix design and that there were no buyers other than Baker Hughes," Ide
Aff. at ¶ 5, and (2) with regard to responding to a sales inquiry by APS on behalf of Gyrodata,
"having heard nothing further from Mr. Turner or APS regarding a suspension for Gyrodata, my
understanding was that this opportunity never came to pass."  <u>Id.</u> at ¶ 4.  There are no
attestations that describe the meeting after the 1997 Letter, whether Ide or Turner had intended
to form a joint venture by virtue of their splitting 50/50 gross profits on the RIDE Product, or any
other discussion of RIDE's business relationship with APS that would tend to prove the
existence of a joint venture between the parties.

is wholly ex contractu, i.e., it is not a status created from law.") (citations omitted). Rather than providing examples of the intention of the parties—or even of Ide—to form an informal joint venture, instead of a joint venture company under Phase Two of the 1994 Agreement, Ide provides merely that Turner "asked" to split gross profits 50/50 early in the relationship. Importantly, he has not come forward with evidence upon which a reasonable jury could rely to infer that this splitting of profits was understood and intended by the parties to provide the basis for a joint venture.

Further, Ide's 1997 Letter, which was sent after the 50/50 split of gross profits had begun, makes clear that Ide was not satisfied with the parties' current 50/50 split of gross profits—the same arrangement that he is now arguing is the basis for the joint venture. Defs.' Ex. I at 1-2. Indeed, no reasonable jury could conclude that a joint venture was constituted prior to the 1997 Letter, given Ide's own description of the situation: "[a]s a sign of 'good faith' we began evenly splitting the gross profits prior to the $250,000 sales target in the expectation a joint venture would be formed. . . . Despite these good faith efforts, the joint venture has not been formed." Id. at 1-2 (emphasis added).

Subsequent to the 1997 Letter, plaintiffs argue that Ide's deposition testimony about the meeting between Ide and Turner demonstrates that "the parties resolved to continue their joint venture relationship." Pls.' L.R. 56(a)2 Stmt. at § I, ¶ 13. However, plaintiffs failed to provide evidence to support the intent of Ide to create a joint venture prior to the 1997 Letter, as discussed above, and do not proffer any evidence that the joint venture was created at this meeting. The mere fact that the parties met does not evidence creation or continuance of a joint venture relationship. A conclusory argument

that the parties continued the joint venture[13] does not suffice.  "The pleading party
cannot merely make conclusions of law without alleging facts which would bring the
case within any of the recognized grounds for that particular cause of action."  Del
Greco Realty Co., Inc. v. Lamoureux, 39 Conn.Sup. 95, 98–99 (1983) (citing Cavallo v.
Derby Savings Bank, 188 Conn. 281, 283, 285 (1982)). At the summary judgment
stage, plaintiffs must come forth with evidence.

Even assuming plaintiffs' evidence shows that Ide intended to enter an informal
joint venture partnership with Turner and APS, plaintiffs still do not raise a material issue
of fact with regard to the intentions of APS or Turner[14] to form an informal joint venture,
whether by an oral modification of the 1994 Agreement or an entirely different oral
understanding.  Rather, Ide states that, following the 1997 Letter, Turner told him, "Let's
get back to work and keep it going. We're a good business, we're both making money
on it, so let's continue."  Pls.' Ex. 30 at 147.  What, exactly, the parties are continuing is
unclear, as the 1997 Letter claimed that Turner was in breach of the 1994 Agreement
because no joint venture had been formed.  Because the plaintiffs provide no evidence
as to what understanding was developed between the parties at this meeting and, given
Ide's recounting of Turner's desire to continue the status quo—which by Ide's own

_____

[13] At this meeting, Ide describes Turner as saying, "We're not going to do it [attribute
materials to APS which are RIDE's] again. Let's get back to work and keep it going.  We're a
good business, we're both making money on it, so let's continue." Mar. 20 Ide Depo. at 146:22-
147:11.

[14] The only evidence that the court finds regarding Turner's intent to form a joint venture,
outside of the conduct discussed above, is Turner's comment from his deposition testimony
which plaintiffs use to support the fact that a "continuing contract" exists and which they claim
stands for the proposition that "[n]either party terminated the 1994 Agreement."  Pls.' L.R.
56(a)2 Stmt. at § II, ¶17 (citing Pls.' Ex. 42 ("June 2013 Turner Dep.") at 39:23-40:17, stating
that he was not "qualified to answer" whether APS terminated the 1994 Agreement and that
"[w]e were still honoring [the 1994 Agreement]" after two years).

admission was <u>not</u> a joint venture—a reasonable jury could not find that Turner had ever had the intention to form a joint venture with Ide, let alone formed one.

Plaintiffs also argue that an internal business plan, dated April 15, 1995, "describ[ing] its relationship with RIDE as a 'strategic alliance,'" Pls.' Opp. at 10, is evidence of the existence of a joint venture between the parties.  The same business plan purportedly notes that APS formed strategic alliances with three companies, Pls.' Ex. 42 at 28, and that, "[f]or the development of the elastomeric suspension, the vibration isolation sub, and the elastomeric flex coupling it has partnered with RIDE, a company which specializes in designing with elastomers."  Pls.' L.R. 56(a)2 Stmt. at § II, ¶ 35.[15] However, this internal business plan was created in 1995, prior to the 1997 Letter in which Ide indicated to Turner and APS that they were in breach of the 1994 Agreement and that no joint venture had been formed.[16]  Further, representing oneself as in a "strategic alliance," and, even accompanied by Ide's deposition testimony which asserts that "we're partners," Mar. 20 Ide Depo. 203:14, 203:17, does not transform the relationship into a joint venture and is insufficient to raise an issue of material fact with regard to the required intent element of a joint venture.  See <u>Kosower v. Gutowitz</u>, No. 00CIV.9011, 2001 WL 1488440, at *6 (S.D.N.Y. Nov. 21, 2001) ("[C]alling an organization a partnership does not make it one") (citation omitted).  An alliance does

---

[15] Here, the plaintiffs quote this line as read by the deposing lawyer, Mr. Jasinski, to Turner, who affirmed that the lawyer read the lines correctly. <u>See</u> Pls.' Exs. 42, 28.  The business plan at issue has not been provided by the plaintiffs.

[16] This April 1995 business plan also was created prior to a potential joint venture forming under the terms of the 1994 Agreement.  "This agreement will be in two phases; Phase One will be for one year, or until $250,000 in annualized sales is reached, whichever comes first. Phase Two will be after Phase One is complete."  Defs.' Ex. A. (1994 Agreement) at ¶ 3. One year after the signing of the Agreement was around May/June 1995; the parties had not reached $250,000 in annualized sales at that time, and did not do so until sometime in 1997. Pls.' Ex. 28 ("Exhibit 1-A Isolator Sales Schedule") at 4.

not make a joint venture.  While it is possible that the parties' conduct modified the 1994 Agreement, or created an altogether different oral agreement, to create a joint venture, the evidence proffered by the plaintiffs, as discussed above, is insufficient to support a finding of the requisite intention to form a joint venture, even after taking the facts in the light most favorable to the plaintiff.

In addition to failing to create a material issue of fact with regard to the intent element of a joint venture, plaintiffs also fail to come forward with any evidence from which a reasonable jury could find at least two other required elements of a joint venture: shared losses and joint control.  In response to the defendants' argument that the plaintiffs failed to allege joint control and joint losses, the plaintiffs responded that defendants have not presented evidence showing a lack of these elements.  Pls.' L.R. 56(a)2 Stmt. at § II, ¶ 38; see also Pls.' Opp. at 11 n. 9.  Contrary to the plaintiffs' assertion, the defendants meet their burden on summary judgment by pointing out the absence of evidence with regard to the sharing of joint control, Fed. R. Civ. P. 56, but the plaintiffs have not met their burden under Rule 56 to come forward with some evidence from which a reasonable jury could find that joint control of the alleged joint venture exists.  Fed. R. Civ. P. 56(e).

With regard to the sharing of losses, Ide, when asked about what losses the parties shared, could only provide the example of "scrapped units."  Pls.' L.R. 56(a)2 Stmt. at § II, ¶ 38; Mar. 20 Ide Depo. 70:7-70:24.  No evidence has been provided to support Ide's assertion that scrapped units would be considered losses,[17] and the

---

[17] Indeed, the plaintiffs acknowledge that, "[a]lthough sales of the RIDE Product to Baker Hughes were profitable, Plaintiffs and Defendants did share the cost of scrapped units."  Pls.' L.R. 56(a)2 Stmt. at § II, ¶38.

plaintiffs have not come forward with evidence showing that the parties either agreed to or actually did share losses.

Instructively, under New York law, two companies who maintained a business relationship for over thirteen years were found, on a summary judgment motion, not to have had a joint venture. Kid Cloz, Inc. v. Officially for Kids, Inc., 320 F. Supp. 2d 164, 175 (S.D.N.Y. 2004). As in the present case, the parties had expressly considered, but did not, formalize their relationship into a separate company; they also spoke of themselves as partners. Id. at 172-74. The court in Kidz Cloz concluded that such actions did not constitute sufficient intent to form a joint venture partnership under the summary judgment standard because "no juror could conclude that [he] intended to enter into a fiduciary relationship with [her], or even that [she] believed [that he] intended to enter into such a relationship." Id. at 174 (citation omitted). The facts in this case are similar, as both parties agree that the joint venture company was not created and the plaintiffs have failed to raise a material issue of fact that would otherwise indicate another, less formal, joint venture than the one they initially contemplated. The internal business plan of this case pales in comparison to the business cards and representation to the industry that the parties in the Kidz Cloz case made. Id.

This court also concludes that the parties' agreement to share sales commissions—even if considered an agreement to share profits—would not meet the requisite element of agreeing to share joint profits and losses because the parties never discussed what would occur in the event of a loss. Id. at 174-75. In the present case, the plaintiffs have not come forward with sufficient evidence on which a reasonable jury could find that the sharing of losses was discussed, let alone agreed upon. Further, the

plaintiffs have not provided evidence that their "loss"—the cost of scrapped products—can properly be considered a loss, in the sense that the joint venturers must agree upon sharing.

Overall, plaintiffs have failed to present evidence sufficient to raise a material issue of fact for three elements—intent, joint control and shared losses—which are required in order to constitute a joint venture under Connecticut law. Because the record lacks sufficient evidence to support even a bare claim that the parties entered a joint venture, either by written or oral contract, the plaintiffs' claims for breach of written contract and breach of oral contract—insofar as they rely on a joint venture—fail.

B.   Breach of Fiduciary Duty and Accounting

Plaintiffs and defendants agree that the breach of fiduciary duty and accounting claims are based upon the existence of a joint venture relationship. Pls.' Opp. at 9; Defs.' Mem. at 16; see also Waterview Site Services, Inc. v. Pay Day, Inc., Nos. CV054004988S, CV065001330S, 2008 WL 4307871, at *5 (Super. Ct. Conn. 2008). Given the court's conclusion that there are no material issues of fact and thus, as a matter of law, no such joint venture exists, the breach of fiduciary duty and accounting claims also fail.

C.   Statute of Limitations

Alternatively, defendants have argued that, even if the plaintiffs survive summary judgment on the existence of a joint venture, the plaintiffs' claims fail because they are barred by the statute of limitations. The parties agree that plaintiffs' claims for breach of a written contract, breach of an oral contract, and accounting are all subject to the six-year statute of limitations under Conn. Gen. Stat. § 52-576(a). Pls.' Opp. at 23; Defs.'

Mem. at 29-30. They also agree that the statute of limitations on CUTPA claims is three years under Conn. Gen. Stat. § 42-110g(f). Pl.'s Opp. at 24; Def.'s Mem. at 30.

        1.     Breach of Contract, Breach of Oral Agreement

Under Connecticut law, "[i]n an action for breach of contract such as is alleged in the present case, the cause of action is complete at the time the breach of contract occurs, that is, when the injury has been inflicted." Kennedy v. Johns-Manville Sales Corp., 135 Conn. 176, 180 (1948). Plaintiffs' alleged breach in this case is argued to be when APS made sales of the APS Product without sharing the profits with RIDE. TAC at ¶ 91. Ide, in his Affidavit, testifies that, "[u]ntil discovery in this litigation, I did not know that, beginning in 2003, APS had sold a flexible coupling that included a metal/rubber helix design almost identical to the RIDE Product to Gyrodata and other customers for use in a suspension." Ide Aff. at ¶ 7 (emphasis added). Under the six-year statute of limitations for contracts, a breach of contract claim seeking to recover for APS Products sales prior to November 7, 2005, would be untimely, as the plaintiffs filed this case on November 7, 2011. However, plaintiffs argue that the statute of limitations is tolled under the continuing course of conduct doctrine. Pls.' Opp. at 24-25.

Under Connecticut law,

[W]hen the wrong sued upon consists of a continuing course of conduct, the statute does not begin to run until that course of conduct is completed . . . [I]n order [t]o support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such wrong. . . . Where [our Supreme Court has] upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act. . . . Thus, there must be a

24

determination that a duty existed and then a subsequent determination of
whether that duty is continuing.

Stuart v. Snyder, 125 Conn.App. 506, 510–11 (2010) (citation and internal quotation
marks omitted).

As discussed above, the plaintiffs have not shown that they are joint venture
partners who owe a fiduciary duty to one another and, as such, they do not have a
"special relationship" derived from a joint venture.  Under Connecticut law, it is clear that
a regular contractual relationship between business entities, such as the 1994
Agreement, does not create a special relationship.  See OBG Technical Services, Inc. v.
Northrop Grumman Space & Mission Systems Corp., 503 F. Supp. 2d 490, 511 (D.
Conn. 2007).

Plaintiffs, instead, seek to rely on their characterization of the 1994 Agreement as
a "continuing contract."  Pls.' Opp. at 25.  This argument also fails because the
continuing course of conduct doctrine "has no application after the plaintiff discovered
the harm."  Rosato v. Mascardo, 82 Conn. App. 396,405 (2004).  The harm done need
not have been known in its entirety to foreclose the applicability of this doctrine.  See
Intellivision v. Microsoft Corp., 784 F.Supp.2d 356, 371 (S.D.N.Y. 2011) (applying
Connecticut law) ("The plaintiffs confuse concealment of the extent of damage with
concealment of the fact of damage; the latter may be grounds for tolling, but the former
is not.").

When Ide sent the 1997 Letter to Turner, the plaintiffs acknowledged that "[they]
believe[d] [APS] to have breached our written and verbal agreements" because they
failed to create a joint venture company.  Defs.' Ex. I at 1. The plaintiffs' failure to come
forward with additional facts that would support a finding that the APS Product

continued to be covered under the 1994 Agreement, particularly given the fact that

Turner was a co-patentee of the '541 patent[18] upon which the APS Product was

based,[19] necessitate that the remaining contract claims and all other claims deriving

from the applicability of the 1994 Agreement fail.

> 2.      Breach of Implied Covenant of Good Faith and Fair Dealing

Defendants argue that "[t]he absence of either a written or oral contract is also

fatal to Plaintiff's breach of the implied covenant of good faith and fair dealing claims in

Count IV, which can only be based on the existence of a contract."  Defs.' Mem.   at 15-

16.  Plaintiffs argue that:

> [i]t is true that the <u>existence</u> of a contract is a prerequisite for this claim,
> <u>see, e.g.</u>, <u>Bruno v. Whipple</u>, 138 Conn. App. 496, 510 (2012), but
> Defendants do not challenge the <u>existence</u> of a contract – namely, the
> 1994 Agreement, <u>see supra</u> Part III.A. For this reason alone, the Court
> should reject Defendants' argument with respect to Count IV.

Plaintiffs also argue that there is a six-year statute of limitations on a breach of the

implied covenant of good faith and fair dealing claim.  Pls.' Opp. at 24 (citing <u>Bellemare</u>

<u>v. Wachovia Mortg. Corp.</u>, 94 Conn. App. 593, 610 (2006)).  Defendants argue that

there is no clear-cut authority as to whether a three-year or a six-year statute of

limitations applies. Defs.' Mem. at 29-30 (citing <u>Cornerstone Realty, Inc. v. Dresser</u>

<u>Rand Co.</u>, 993 F. Supp. 107, 110 n.2 (D. Conn. 1998)).  Even assuming plaintiffs' view

of the law is correct, the plaintiffs' claim is time-barred.

---

[18] A fact which plaintiffs were aware of as of 1998, when Ide's patent attorney received notice that the '541 patent had issued.  Defs.' L.R. 56(a)1 Stmt. at ¶ 33; Pls.' 56(a)2 Stmt. at § I, ¶ 33; Defs.' Ex. EE.

[19] The '541 patent covers the metal/rubber helix, Pls.' Opp. at 18, which is the crux of the plaintiffs' argument that "but for Ide's contribution of the Flex Coupling's metal/rubber helix to the RIDE Product, APS would not be selling the APS Product."  <u>Id.</u> at 20.

In response to the evidence that suggests that the pertinent facts underlying the plaintiffs' claims occurred during the period 1997 through 2003, see Defs.' Mem. at 31-32, plaintiffs argue that the continuing course of conduct doctrine applies to this claim and that the 1994 Agreement, having never been terminated, is in continuous operation. Pls.' Opp. at 25.  The court has concluded that there is no continuing duty based on the alleged joint venture relationship between the parties.  The court also concluded that any breach that derives from the 1994 Agreement similarly fails because the plaintiffs' knew of the breach in 1997.

Therefore, even using the longer limitations period, the plaintiffs' claim of breach of the implied covenant of good faith and fair dealing is barred by the statute of limitations.

### 3.    CUTPA

Plaintiffs indicate that their CUTPA claim relies on the statute of limitations being tolled under the continuing course of conduct doctrine.[20]   The court has concluded that there was no special relationship between the parties based on a joint venture relationship.[21]   The plaintiffs have not raised any other argument as to why their CUTPA

---

[20] Plaintiffs identify their tort claims as "those otherwise subject to the three-year statute of limitations," and specifically cite CUTPA cases in support.  Pls.' Opp. at 26.

[21] As set forth above, plaintiffs claim that defendants owed them a fiduciary duty as joint venture partners, and their tort claims rest upon defendants' continuing course of conduct of failing to share profits on sales of the APS Product.  Id.  For a continuing course of conduct to toll the statute of limitations, "there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto." Stuart v. Snyder, 125 Conn.App. 506, 510 (2010) (internal quotation marks omitted).

claims toll under the continuing course of conduct doctrine.  Therefore, the court

concludes that the plaintiffs' CUTPA claims are barred by the statute of limitations.[22]

     D.   <u>Unjust Enrichment</u>

The only remaining claim upon which relief could be granted[23] is based on

plaintiffs' argument that, "if Defendants are found not to have had a joint venture

relationship with Ide and RIDE, then Defendants have been unjustly enriched by having

obtained 50% of gross profits on the sale of the RIDE Product from 1996 – 2009, as

opposed to a 10% commission."  TAC at ¶ 124.

Defendants argue that, under either a three-year or a six-year statute of

limitations, the plaintiffs' claim is untimely.  Defs.' Mem. at 29-30.  Under Connecticut

law,

> A right of recovery under the doctrine of unjust enrichment is essentially
> equitable, its basis being that in a given situation it is contrary to equity
> and good conscience for one to retain a benefit which has come to him at
> the expense of another. . . .  With no other test than what, under a given
> set of circumstances, is just or unjust, equitable or inequitable,
> conscionable or unconscionable, it becomes necessary in any case where
> the benefit of the doctrine is claimed, to examine the circumstances and
> the conduct of the parties and apply this standard. . . .  Unjust enrichment
> is, consistent with the principles of equity, a broad and flexible remedy. . . .
> Plaintiffs seeking recovery for unjust enrichment must prove (1) that the
> defendants were benefited, (2) that the defendants unjustly did not pay the
> plaintiffs for the benefits, and (3) that the failure of payment was to the
> plaintiffs' detriment.

---

[22] The plaintiffs note that "[w]hether the continuing course of conduct doctrine applies at
all to CUTPA is an issue currently before the Connecticut Supreme Court.  <u>See</u> <u>Flannery v.
Singer Asset Finance Co., LLC</u>, 128 Conn. App. 507 (2011), <u>cert. granted</u> 302 Conn. 902
(2011)."  <u>Id.</u> at 26 n.23.

[23] Plaintiffs' theory under unjust enrichment, which relies upon the existence of a joint
venture, fails.  <u>See</u> TAC at ¶123 ("[i]f the parties are found to have had a joint venture
relationship . . .").

Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co., 231 Conn. 276, 282–83

(1994) (citations and internal quotation marks omitted).

Plaintiffs argue that the defendants' benefit is the receipt by the defendants of

50/50 gross profits from the sale of the RIDE Product, as compared to a 10%

commission.  TAC ¶ 124.  The plaintiffs have stated that they changed the sales

revenue arrangement, upon Turner's request, from a 10% commission to 50/50 gross

profits. Mar. 20 Ide Dep. 33:8-33:19. They have also alleged that, "[a]s a sign of "good

faith" we began evenly splitting the gross profits prior to the $250,000 sales target in the

expectation a joint venture would be formed. . . ."  Defs.' Ex. I at 1-2.

In the 1997 Letter, Ide asked for a refund of the surplus percentage that APS had

been paid: "APS is required to refund the 50% gross profits paid to APS in 'good faith'

towards formation of the joint venture. We believe our obligation should be limited to a

10% sales commission."  Id. at 2.  The plaintiffs, at this point, apparently considered

taking legal action, but did not.[24]  Id.  Instead of taking legal action on the 1994

Agreement, or on modifications thereof as the basis for obtaining relief, Ide met with

Turner, who stated that they should continue the business and, subsequently, they

continued to split the gross profits with APS on a 50/50 basis until the RIDE Product

sales ended in 2009.  In 2011, the plaintiffs asked for the exact damages they sought in

the 1997 Letter.

Fourteen years after Ide sent the 1997 Letter, Ide emailed Turner and

characterized their relationship as follows:

---

[24] See, e.g., Defs.' Ex. I ("We intend to pursue all legal and injunctive means available to
resolve these issues.").

> "[w]hile the relationship was initially based on a 10% representation
> agreement [the 1994 Agreement], it was quickly changed to a 50/50 split
> of the gross profits. The 50/50 split was agreed to in anticipation of
> forming a joint venture company which was never formalized. We did
> agree on the partnership for helical elastomer couplings and split the
> gross profits of millions of dollars over the ensuing years. This business
> ceased in 2009 when orders stopped."

Defs.' Ex. J at 3. The plaintiffs have not come forward with any additional evidence as
to the factual circumstances surrounding the 50/50 split of the RIDE Product's proceeds
but, rather, the plaintiffs reiterated that the 50/50 gross profits split was agreed to in
anticipation of a joint venture that "was never formalized." Id. at 3

    While the court cannot be sure that plaintiffs' claim would have been successful if
brought under a breach of the 1994 Agreement given Ide's conduct,[25] the court
concludes that the claim is essentially based in contract, and seeks relief which has not
changed since 1997.[26]  See Rosenberg v. Langdon, No. CV064018350, 2009 WL
4682065, at *6 (Conn. Super. Ct. Aug. 11, 2009) (holding that a plaintiff's unjust
enrichment claim failed on summary judgment because it would be decided using the
same standards as the contract claim which was dismissed on statute of limitations
grounds).  It is this court's conclusion that this claim also fails.

---

[25] A party entitled to demand strict performance of a contract term may waive
performance of that term, and this may be shown by acts evidencing that intent. Finlay v.
Swirsky, 103 Conn. 624, 635-36 (1925). When Ide noted that Turner "asked" for the profit
scheme to be adjusted from a 90/10 commission to a 50/50 splitting of profits, he did not state
that he agreed, but he did continue to conduct the RIDE/APS relationship as a 50/50 split.
Taking the facts in the light most favorable to the plaintiffs, Ide consented to this change as a
"show of good faith" that the parties would form a joint venture company, which never
materialized. Instead of suing Turner in 1997 to demand strict performance of the 1994
Agreement (i.e., that APS refund the surplus that they received from the 50/50 split), he chose
to continue splitting the gross profits on a 50/50 basis with Turner—for another 12 years, until
2009.

[26] Plaintiffs' Third Amended Complaint alleges no facts to support the unjust enrichment
claim other than those pled in support of the contract claims. See TAC at ¶ 124.

However, the existence of a contract does not preclude equitable relief, so long as it is not inconsistent with the contract.  Town of New Hartford v. CRRA, 291 Conn. 433, 455 (2009).  Further,

> [I]n an equitable proceeding, a court may provide a remedy even though the governing statute of limitations has expired, just as it has discretion to dismiss for laches an action initiated within the period of the statute. . . . Although courts in equitable proceedings often look by analogy to the statute of limitations to determine whether, in the interests of justice, a particular action should be heard, they are by no means obliged to adhere to those time limitations.

Dunham v. Dunham, 204 Conn. 303, 326–27 (1987) (citations omitted).  While not obliged to adhere to the statute of limitations in connection with the unjust enrichment claim, this court has nothing before it that would cause it to ignore that statute of limitations, or, put another way, to recognize a claim plaintiffs failed to pursue for fourteen years.  The plaintiffs here entered into a contract, which was then modified, with no objection, for many years.  Plaintiffs complained of the defendants' conduct in the 1997 letter, a complaint which is essentially equivalent to their claims in this case, filed in 2011.  After sending their 1997 letter, the plaintiffs did nothing to signal their discontent with their arrangement (or lack of one) with the defendants.   Even though this court has discretion to award relief in equity despite the statute of limitations, it chooses not to.  There is nothing before the court which would incline it to that conclusion.

V.    **CONCLUSION**

For the foregoing reasons, the defendants' Motion for Summary Judgment on All Counts (Doc. No. 87) is **GRANTED**.  The plaintiffs' Motion for Partial Summary Judgment (Doc. No. 85) is **GRANTED** absent objection (Doc. No. 101).

**SO ORDERED.**

Dated at New Haven, Connecticut this 31st day of March, 2014.

/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge