### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | : | |
| RIDE, INC., and RUSSELL D. IDE, | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:11-CV-1721 (JCH) |
| | : | |
| APS TECHNOLOGY, INC. and | : | |
| WILLIAM E. TURNER, | : | DECEMBER 30, 2015 |
| Defendants. | : | |
| | : | |

**RULING RE: DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT (DOC. NOS. 160 AND 161)**

## I.      INTRODUCTION

This is a diversity action filed by plaintiffs Russell D. Ide ("Ide") and RIDE, Inc. ("RIDE") against defendants William E. Turner ("Turner") and APS Technology, Inc. ("APS"), which was returned to this court following the Second Circuit's decision affirming in part, vacating in part, and remanding the court's original grant of summary judgment for the defendants.  See RIDE, Inc. v. APS Technology, Inc., 612 Fed. Appx. 31 (2d Cir. 2015).  The Circuit affirmed the court's decision that the parties never had a joint venture relationship, as well as this court's grant of summary judgment for the defendants on the plaintiffs' causes of action for unjust enrichment, accounting, breach of fiduciary duty, and violation of the Connecticut Unfair Trade Practices Act ("CUPTA"), section 42-110b(a) of the Connecticut General Statutes ("C.G.S.A.").  See id. at 35. However, the Circuit Court vacated the court's grant of summary judgment for defendants on plaintiffs' claims of breach of contract, breach of oral contract, and breach of the implied covenant of good faith and fair dealing, and remanded the case for further proceedings.  See id.

Immediately after the case was remanded, defendants filed a renewed motion for summary judgment on plaintiffs' remaining claims.  See Second Mot. for Summ. J. (Doc. No. 160).[1]  For the reasons set forth below, the court **DENIES** the defendants' Second Motion for Summary Judgment (Doc. No. 160).

## II.   FACTUAL BACKGROUND

### A.   The 1994 Agreement[2]

Ide is the president of RIDE, a Rhode Island corporation.  See Rule 26(f) Report of Planning Meeting ("Rule 26(f) Report") at 3-4 (Doc. No. 29).  Turner is the president of APS, a Connecticut corporation.  See id.  In mid-1994, Turner and Ide, acting on behalf of APS and RIDE, executed a two-page letter agreement ("the 1994 Agreement") that "set forth [the parties'] understanding and agreement as to the development of [their] mutual business interest in developing technical products for the oilfield and other industries."  1994 Agreement at 1 (Doc. No. 160-3).  The 1994 Agreement specifies that,

> [t]he products agreed upon are flexible couplings, sealed bearings, flow restrictors, and deflection pad silicon carbide bearings including any product covered by patents 5,048,981; 5,135,060; 5,007,490; 5,048,622; 5,007,491; and other patents such as the threaded, rubber injected flex coupling and the spiral groove flow restrictor.

---

[1] The Motion for Summary Judgment located at Doc. No. 160 is a redacted, public version of that filing.  Defendants also filed unredacted, sealed versions of the Motion for Summary Judgment and supporting documents, which are located at Doc. No. 161.  Citations throughout this Ruling are to defendants' redacted Motion for Summary Judgment, supporting memoranda, Local Rule 56(a)1 statement, and exhibits.  See Doc. No. 160.

[2] Unless otherwise noted, the parties have indicated that these facts are undisputed, either in their Statement of Undisputed Facts accompanying their Rule 26(f) Report (Doc. No. 29) or by statements in their respective Local Rule 56(a) filings (Doc. Nos. 160-2 and 162-1).

Id.  The 1994 Agreement further specifies that the parties' agreement "will be in two

phases."  Id.  In Phase One, RIDE granted APS Technology "exclusive rights to market

and distribute the above products," and in return APS would receive 10% of the receipts

for any sales made, with the remaining 90% going to RIDE.  Id.  The parties agree that

Phase One of the 1994 Agreement ended no later than June 3, 1995.  See Plaintiffs'

Local Rule 56(a)2 Statement ("Pls.' L.R. 56(a)2 Stmt.") at 5 ¶ 6 (Doc. No. 162-1).[3]

Phase Two was to be the formation of a joint venture to "design, manufacture, market,

and distribute the above products," with ownership of the joint venture divided equally

between APS and RIDE.  1994 Agreement at 1 (Doc. No. 160-3).  However, neither a

formal joint venture company nor an informal joint venture relationship was ever

established by the parties.  See RIDE, 612 Fed. Appx. at 32-33.

    B.    The RIDE Product and the APS Product

        Beginning in 1996, APS and RIDE sold a suspension ("the RIDE Product") to

Baker Hughes INTEQ ("Baker Hughes") and shared certain, but not all, costs and

proceeds from that sale on a 50/50 basis.  See Rule 26(f) Report at 4 (Doc. No. 29).

APS sold the RIDE Product to Baker Hughes, while RIDE provided the manufacturing,

testing, inspection, and shipping of the RIDE Product.  See id.  Sales of the RIDE

Product, and the related costs/proceeds sharing arrangement between the parties,

continued until approximately 2009.  See id.

_____

[3] Citations throughout this Ruling are to plaintiffs' redacted Memorandum of Law in Opposition to Defendants' Renewed Motion for Summary Judgment, Local Rule 56(a)2 statement, and exhibits. Unredacted versions of these documents were filed and can be found at docket entry 164.

Beginning in 2003, APS—acting without RIDE—began selling a suspension ("the APS Product")[4] to other parties.  At some point after sales of the APS Product commenced, RIDE became aware that APS was marketing and selling the APS Product.  Believing that sales of the APS Product violated the agreements between the parties, the plaintiffs filed the present lawsuit on November 7, 2011.

## III.   STANDARD OF REVIEW

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).  Once the moving party has met its burden, in order to defeat the motion, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor, Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record to determine whether there are disputed issues of material fact, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  See Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  Summary judgment "is properly granted only when no

---

[4] The parties do not define the term "the APS Product" with specificity in their briefing, although both parties use that phrase.  At oral argument, defendants stated that the APS Product is a suspension that was originally sold to a company called Gyrodata, although the product was subsequently sold to other customers as well.  Plaintiffs stated that the APS Product is any suspension sold by APS containing a metal/rubber helix like the one used in the RIDE Product.  It is not clear whether APS sells more than one suspension that meets this criterion.  However, because the court is mindful of the standard that applies to the court's consideration of summary judgment motions, the court will use the definition of the APS Product set forth by plaintiffs at oral argument for purposes of this Ruling.  See Pls.' L.R. 56(a)2 Stmt. at 14 ¶ 25 (Doc. No. 162-1) (defining "the APS Product" as "metal/rubber helix suspensions" sold by APS).

rational finder of fact could find in favor of the non-moving party." <u>Carlton v. Mystic Transp., Inc.</u>, 202 F.3d 129, 134 (2d Cir. 2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised, on the basis of the evidence presented, the question must be left to the finder of fact. <u>Sologub v. City of New York</u>, 202 F.3d 175, 178 (2d Cir. 2000).

## IV.   DISCUSSION

The claims pled by plaintiffs that survived the court's Ruling on defendants' first Motion for Summary Judgment and the Second Circuit's review of that Ruling, <u>see</u> <u>RIDE</u>, 612 Fed. Appx. at 35, are breach of contract and breach of the implied covenant of good faith and fair dealing.  Defendants have moved for summary judgment on these claims.  <u>See</u> Second Mot. for Summ. J. (Doc. No. 160).

### A.   Breach of Contract

Although the Second Circuit directed the court to consider whether plaintiffs have a viable claim related to either breach of written contract or breach of a separate oral contract, at oral argument plaintiffs conceded that they have abandoned their claim that a separate oral agreement existed between the parties.  Instead, plaintiffs contend that the 1994 Agreement[5] was orally modified by the parties such that it covered sales of both the RIDE Product and the APS Product.  Thus, plaintiffs' sole breach of contract

---

[5] Neither party argues that there was a written agreement besides the 1994 Agreement that governed the relationship between the parties.  <u>See, e.g.</u>, Plaintiffs' Memorandum of Law in Opposition to Defendants' Renewed Motion for Summary Judgment ("Pls.' Opp.") at 10 (Doc. No. 162) (characterizing the 1994 Agreement as the only written agreement between the parties); <u>cf.</u> Memorandum of Law in Support of Defendants APS Technology, Inc.'s and William E. Turner's Renewed Motion for Summary Judgment ("Defs.' Mem.") at 2 (Doc. No. 160-1) (noting that plaintiffs' claims relate to "the 1994 Agreement, an oral modification to that agreement, or a separate oral contract altogether").

claim is that defendants breached the modified 1994 Agreement when they sold the APS Product and did not share profits from those sales with plaintiffs.

In response, defendants argue:  (1) that neither the RIDE Product nor the APS Product were covered by the 1994 Agreement, and (2) that the 1994 Agreement was not modified by the parties and therefore expired on its own terms decades ago.  Either of these arguments, if proven under the Rule 56 standard, would warrant the granting of summary judgment for the defendants.  Therefore, the court will consider these arguments separately and in turn.

1.    The 1994 Agreement

The dispute between the parties about whether the RIDE Product and APS Product are covered by the 1994 Agreement is primarily a dispute about how the first full paragraph of that agreement should be interpreted.[6]  That paragraph provides:

> [t]he products agreed upon are flexible couplings, sealed bearings, flow restrictors, and deflection pad silicon carbide bearings including any product covered by patents 5,048,981; 5,135,060; 5,007,490; 5,048,622; 5,007,491; and other patents such as the threaded, rubber injected flex coupling and the spiral groove flow restrictor.

1994 Agreement at 1 (Doc. No. 160-3).

The parties agree that the 1994 Agreement's reference to "other patents such as the threaded, rubber injected flex coupling" is a reference to what became United States Patent 5,447,472 ("the '472 Patent"), which discloses Ide as the inventor.[7]  Neither party has argued that any product other than the

---

[6] Defendants agree that the 1994 Agreement was a valid contract.  <u>See</u> Answer, Affirmative Defenses and Counterclaims to Plaintiffs' Third Amended Complaint at 8 ¶ 80 (Doc. No. 38) (admitting paragraph 80 of plaintiffs' Third Amended Complaint, which says "[t]he 1994 Agreement is a valid and enforceable contract").

flexible coupling is implicated in this lawsuit.  Thus, for purposes of this lawsuit, the parties agree that the relevant portion of the 1994 Agreement should be read as follows:  "The products agreed upon are flexible couplings . . . including any product covered by . . . [the '472 Patent]."  The parties disagree about whether the RIDE Product and APS Product are "flexible couplings" within the meaning of the 1994 Agreement.  Based on the analysis that follows, the court concludes that whether the 1994 Agreement's reference to "flexible couplings" means that sales of the RIDE Product and the APS Product are covered by the 1994 Agreement is a genuine dispute about an issue of material fact.

As a preliminary matter, the court must determine whether the question of what is meant by the term "flexible coupling" is a question of law, appropriate for the court to resolve at the summary judgment stage, or whether this is a question of fact that must be reserved for the jury.  Connecticut courts[8] recognize that, "[a]lthough ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . where there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law."  Levine v. Massey, 232 Conn. 272, 277-78 (1995) (internal quotations, citations, and alterations omitted).  "A contract is unambiguous when its language is clear and conveys a definite

---

[7] Third Am. Compl. at 3 ¶ 17 (Doc. No. 35); Deposition of William E. Turner ("Turner Dep.") at 30-31 (Doc. No. 177) ("Q: 'And other patents such as the threaded rubber injected flex coupling,' I'm going to stop there.  Was the threaded rubber injected flex coupling patent the then pending patent application that became the Ide '472 Patent?  A: That's what is intended here."); see also United States Patent Number 5,447,472 (Doc. No. 162-3) (naming Russell D. Ide as the inventor).

[8] The parties have never raised a choice of law issue in this case, either in their many memoranda or at oral argument on the present Motion, and their filings primarily cite to Connecticut cases.  Turner is a resident of, and APS conducts business in, Connecticut.  Third Am. Compl. at 1 ¶¶ 3-4.  In the absence of any dispute on this issue, the court will generally look to Connecticut law.

and precise intent. . . . In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself." United Illuminating Co. v. Wisvest-Connecticut, LLC, 259 Conn. 665, 670-71 (2002).  However, "the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous" and, in fact, "a presumption that the language used is definitive arises when, as in the present case, the contract at issue is between sophisticated parties and is commercial in nature." Id. at 670 (internal quotations and citations omitted).  Ultimately, when determining whether contractual language is ambiguous under Connecticut law, "the words of the contract must be given their natural and ordinary meaning," and the court is instructed not to "torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity." Id. (internal quotations and citations omitted).  But, "[i]f the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." Cruz v. Visual Perceptions, LLC, 311 Conn. 93, 103 (2014).

Although the face of the 1994 Agreement contains clear language—and although the sophisticated nature of the parties and the commercial nature of their agreement creates a presumption under Connecticut law that the language they used is definitive— the key term in the 1994 Agreement, namely what products are meant by the term "flexible coupling," is ambiguous.  From the various patents and related documents submitted by the parties, there appears to be an industry practice of calling patented technology a "coupling" when that same technology can be subsequently engineered for commercial use as either a flexible coupling or a suspension. See, e.g., United States Patent 6,916,248 ("the '248 Patent") at 2, 12 (Doc. No. 162-16) (titled "Flexible

8

Coupling" and indicating that "[t]he present invention provides an improved flexible coupling useful for numerous applications, including, but not limited to, transmitting torque, suspending electronic components from apparatuses carrying the same, and reducing the transmission of vibrations and other applied stresses from interconnected components"); United States Patent 5,833,541 ("the '541 Patent") at 2 (Doc. No. 162-19) (disclosing an "elastomeric joint that can be used, as part of an articulated coupling in a progressive cavity device" and noting that the "coupling can also be used for other applications, especially those involving high torque loads and those requiring suppression of vibrations and shocks").

The idea that a patent for a "coupling" could provide protection for both a commercial coupling and a commercial suspension is further supported by evidence that, around the time the 1994 Agreement was executed, Turner believed the RIDE Product was protected by the '472 Patent.  See Turner Dep. at 75, 154 (Doc. No. 177). Although it is undisputed that the RIDE Product is a suspension, see Rule 26(f) Report at 4 ¶ 7 (Doc. No. 29), the '472 Patent is titled "Articulated Coupling for Use with a Progressive Cavity Apparatus," United States Patent Number 5,447,472 (Doc. No. 162-3) (emphasis added).  In other words, around the time the 1994 Agreement was executed, Turner believed that a patent for an "Articulated Coupling" provided protection for a suspension.  The fact that Turner later decided that the RIDE Product was not adequately protected by the '472 Patent is not to the contrary:  As noted above, both the '248 and '541 Patents, which plaintiffs and defendants agree provide coverage for the APS Product, see Declaration of William E. Turner at 2 ¶ 7 (Doc. No. 160-6) (noting suspensions sold by APS are covered by the '541 and '248 Patents); Pls.' Opp. at 5 &

9

n.6 (Doc. No. 162) (same), also indicate that the inventions disclosed are "couplings" with numerous possible applications, including use as a suspension.

Thus, the parties' use of the phrase "flexible coupling" in the 1994 Agreement could reasonably be interpreted to mean either "flexible coupling" as that phrase is used in patents (i.e., to refer to an invention suitable for adaptation into a commercial coupling or a commercial suspension), or to mean "flexible coupling" in the narrower, commercial sense (i.e., to refer to a specific product that is used to transfer torque, see APS Technology, Inc.'s and William E. Turner's Reply in Supp. of their Renewed Mot. for Summ. J. ("Defs.' Reply") at 5 n.14 (Doc. No. 166)).[9]  Because the term "flexible coupling" is subject to more than one reasonable interpretation, that term is ambiguous, and therefore resolving what the parties meant when they used that term is a question for a finder of fact, not a question for a court to decide as a matter of law at the summary judgment stage.  See Cruz, 311 Conn. at 101 ("When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact." (internal quotations, alteration, and citation omitted)).

Having determined that the term "flexible coupling" is ambiguous and a reasonable interpretation of that term could mean that the term covers suspensions, the court concludes that a reasonable jury could decide that both the APS Product and the RIDE Product are covered by the 1994 Agreement's terms.  As noted above, the parties agree that the relevant portion of the 1994 Agreement can be read, for purposes of this lawsuit, to say:  "The products agreed upon are flexible couplings . . . including any

---

[9] Docket entry 166 is a redacted, public version of defendants' Reply in Support of their Renewed Motion for Summary Judgment.  An unredacted, sealed version of this document was filed and can be found at docket entry 168.

product covered by . . . [the '472 Patent]."  1994 Agreement at 1 (Doc. No. 160-3).

Furthermore, Turner conceded that around the time the 1994 Agreement was executed,

he was under the impression that the technology disclosed in the RIDE Product was

protected by the '472 Patent.  See Turner Dep. at 75, 154 (Doc. No. 177).  Therefore, a

reasonable jury could conclude that, when the parties executed the 1994 Agreement,

they used the ambiguous term "flexible coupling" in the broader sense of technology

that could be developed into a commercial coupling or commercial suspension, and that

the RIDE Product, which was a commercial suspension the parties believed was

protected by the '472 Patent, was therefore covered by the 1994 Agreement.

A reasonable jury could also conclude that the APS Product is covered by the

terms of the 1994 Agreement.  Although neither party alleges that the '472 Patent

directly protects the APS Product, one of the two patents that does cover the APS

Product—the '541 Patent—was filed as a continuation-in-part of the '472 Patent.  See

United States Patent 5,833,541 at 14 (Doc. No. 162-19).  More importantly, however,

the conclusion that a reasonable jury could decide that the APS Product is covered by

the 1994 Agreement is compelled by the plain language of the 1994 Agreement.  The

1994 Agreement says that "[t]he products agreed upon are flexible couplings . . .

including any product" covered by the '472 Patent.  1994 Agreement at 1 (Doc. No. 160-

3) (emphasis added).  The definition of "include" is "[t]o contain as a part of something,"

and the "participle including typically indicates a partial list."  Include, Black's Law

Dictionary (10th ed. 2014).  In other words, the term "including," generally indicates that

the list that follows it is illustrative, not exhaustive.  See Federal Land Bank of St. Paul v.

Bismarck Lumber Co., 314 U.S. 95, 100 (1941) (noting that "the term 'including' is not

one of all-embracing definition, but connotes simply an illustrative application of the general principle").

Thus, a reasonable jury could conclude that the APS Product is a flexible coupling covered by the 1994 Agreement even though the APS Product is not protected by the '472 Patent.  More directly, a reasonable jury could decide that when the parties signed the 1994 Agreement, which states "[t]he products agreed upon are flexible couplings," the parties understood themselves to be entering into a contract that would cover every flexible coupling subsequently developed by the parties until the 1994 Agreement was terminated.  If the jury also concluded that "flexible coupling" is defined in the broader manner advanced by plaintiffs, it could be reasonable for the jury to decide that the APS Product is covered by the 1994 Agreement.  Of course, the jury could conclude the contrary, but because there are disputed issues of material fact about whether the APS Product is subject to the 1994 Agreement, summary judgment on this ground is inappropriate.

   2.   Modification of the 1994 Agreement

Having determined that there are genuine issues of material fact regarding whether the 1994 Agreement covers the RIDE Product and the APS Product, the court must next consider whether there are disputed issues of fact about whether the defendants breached that agreement when they sold the APS Product and failed to share profits on those sales with plaintiffs.

The 1994 Agreement specifies that it will proceed in two phases.  During the first phase ("Phase One"),

> RIDE will grant to APS Technology exclusive rights to market and
> distribute the above products.  APS Technology will deal exclusively with

12

RIDE for engineering and manufacturing the above products.  APS
Technology will pay 90% of the sale receipts to RIDE and APS
Technology will retain 10% of the sales receipts.  Ride will absorb all of
the manufacturing and engineering costs.  APS Technology will absorb all
of the marketing and sales cost.

1994 Agreement at 1 (Doc. No. 160-3). The parties agree that Phase One of the 1994

Agreement ended no later than June 3, 1995.  See Pls.' L.R. 56(a)2 Stmt. at 5 ¶ 6 (Doc.

No. 162-1).

Phase Two of the 1994 Agreement, which was to commence "after Phase One is

complete," involved the formation of "a joint venture . . . to design, manufacture, market,

and distribute the above products."  1994 Agreement at 1 (Doc. No. 160-3).  The Phase

Two joint venture was to be owned "50% by RIDE and 50% by APS Technology."  Id.

However, in its Ruling on defendants' first Motion for Summary Judgment, the court

determined—and the Second Circuit affirmed—that Phase Two of the 1994 Agreement

never happened.  See RIDE, 612 Fed. Appx. at 32-33.

The parties agree that sales of the APS Product did not begin until 2003.  See

Pls.' L.R. 56(a)2 Stmt. at 8 ¶ 18 (Doc. No. 162-1).  Therefore, the plain text of the 1994

Agreement does not provide any basis for plaintiffs' breach of contract claims.  Even if

the APS Product was covered by the first paragraph of the 1994 Agreement, sales of

the APS Product did not begin until nearly a decade after Phase One of the 1994

Agreement ended, which means that neither Phase One nor Phase Two were operative

when sales of the APS Product began.  The text of the 1994 Agreement provides no

contractual duties or responsibilities to which defendants were subject when they began

selling the APS Product in 2003.

However, plaintiffs argue that the parties "modified the 1994 Agreement to substitute their 50/50 profit sharing arrangement for the joint venture company contemplated in phase two of the 1994 Agreement." Pls.' Opp. at 11 (Doc. No. 162). Plaintiffs contend that the modification of the 1994 Agreement was limited to the alteration of these economic terms, and that the modification was total:  according to the plaintiffs, every subsequent sale of any product covered by the 1994 Agreement was subject to the 50/50 profit sharing arrangement agreed to by the parties.  Id. at 11-12.

Under Connecticut law, "[a] written contract can be modified by a subsequent parol agreement if that is the intention of the parties . . . because the parties to a written contract retain the power to alter or vary or discharge any of its provisions by a subsequent agreement."  New England Petroleum Corp. v. Groppo, 214 Conn. 444, 450 (1990) (internal quotations and citations omitted).[10]  Thus, the question for the court at the summary judgment stage is whether there is a genuine dispute about an issue of material fact with respect to whether the parties intended to modify the 1994 Agreement in the manner alleged by the plaintiffs.

In support of their argument that the 1994 Agreement was orally modified by the parties, plaintiffs offer evidence in the form of deposition testimony and a sworn Affidavit from Ide.  See Deposition of Russell D. Ide ("Ide Dep.") (Doc. No. 178); Affidavit of Russell D. Ide ("Ide Aff.") (Doc. No. 179).  In both his Deposition and Affidavit Ide states that shortly after the initial order of the RIDE Product from Baker Hughes, Turner approached Ide about changing "the division of sales revenues under the 1994

---

[10] The court notes that, at oral argument, defendants conceded they do not allege that the special defense of the statute of frauds operates to bar plaintiffs' claims of oral modification of the 1994 Agreement.

Agreement from a 90/10 split to sharing gross profits 50/50," which change Ide testified was not "limited to any particular product or customer."  Ide Aff. at 3 ¶ 10 (Doc. No. 179); see also Ide Dep. at 33 (Doc. No. 178) ("Q: Who approached whom about changing the division of sales revenues under the 1994 agreement from 90/10 to 50/50?  A: Bill [Turner].  Q: Bill approached you?  A: Oh, yeah.").  Plaintiffs also point out that the parties split profits on millions of dollars in sales of the RIDE Product 50/50 from 1996-2009, see Rule 26(f) Report at 4 ¶ 8 (Doc. No. 29), which would tend to suggest that the parties believed there was a formal agreement to share profits 50/50 in place.  Plaintiffs contend that the relevant contract governing this profit sharing was the 1994 Agreement, as modified.  See Pls.' Opp. at 11-12 (Doc. No. 162).

In response, defendants maintain that the parties did not modify the 1994 Agreement, and that whatever the "arrangement" between the parties with respect to sales of the RIDE Product to Baker Hughes may have been, that agreement was limited to the RIDE Product and Baker Hughes.[11]  See Defs.' Mem. at 5 (Doc. No. 160-1). Defendants' support for this contention, however, is the very breach complained of by the plaintiffs, namely that the parties only split profits on sales of the RIDE Product.  See id.; see also Defendants' Local Rule 56(a)1 Statement ("Defs.' L.R. 56(a)1 Stmt.") at 3 ¶ 10 (Doc. No. 160-2).  This evidence is insufficient to carry defendants' burden of establishing that there are no genuine disputes about issues of material fact and that

_____

[11] At oral argument, defense counsel went so far as to say that sales of the RIDE Product to Baker Hughes were covered by an implied contract derived from the course of conduct with respect to Baker Hughes.  However, this position is inconsistent with the testimony of defendant Turner.  At his deposition, Turner said that the parties had a separate "agreement on suspensions" that was a "verbal agreement."  Turner Dep. at 71 (Doc. No. 177).  Thus, the parties agree that there was some kind of formal agreement with respect to sales of the RIDE Product to Baker Hughes—the parties just disagree about whether that agreement was a separate oral contract or an oral modification of the 1994 Agreement.  These are plainly disputes about issues of material fact.

defendants are entitled to judgment as a matter of law.  Plaintiffs' evidence—in particular, Ide's Affidavit—is sufficient to create a genuine dispute of fact about whether the 1994 Agreement was modified in the manner alleged by plaintiffs.

In sum, plaintiffs have adduced sufficient evidence to create genuine disputes on issues of fact related to both (1) the question of whether the RIDE Product and APS Product were covered by the 1994 Agreement, and (2) the question of whether the parties modified the 1994 Agreement to substitute a 50/50 profit sharing arrangement for the Phase Two joint venture contemplated by the Agreement's text.  If these disputed issues were resolved in plaintiffs' favor, a reasonable jury could conclude that the defendants breached their contract with plaintiffs when defendants sold the APS Product and did not share profits on those sales with plaintiffs.  Defendants are not entitled to summary judgment on the merits of plaintiffs' breach of contract claim.

B.    Breach of Implied Covenant of Good Faith and Fair Dealing

Because the court has determined that there are genuine disputes about issues of material fact with respect to whether there was a contract between the parties that governed profit sharing on sales of the APS Product, the court must also reach the question of whether defendants are entitled to summary judgment with respect to plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.

In Connecticut, as in many jurisdictions, the "duty of good faith and fair dealing is a covenant implied into a contract," meaning that "every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." Capstone Bldg. Corp. v. American Motorists Ins. Co., 308 Conn. 760, 794 (2013) (internal quotations omitted).  For a plaintiff to have a cognizable

16

claim of breach of the implied covenant of good faith and fair dealing, "the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 433 (2004) (internal quotations and citation omitted).  "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." Id.  In sum, "[b]ad faith means more than mere negligence; it involves a dishonest purpose." Id.

As with their earlier claim, much of plaintiffs' evidence regarding defendants' alleged breach of the implied covenant of good faith and fair dealing comes from Ide's Affidavit. See Ide Aff. (Doc. No. 179).  Ide attests that, "while sales of the RIDE Product to Baker Hughes were ongoing, [Ide] would regularly ask Mr. Turner whether APS had identified other potential customers for the flexible coupling's metal/rubber helix." Id. at 4 ¶ 14.  According to Ide, "Mr. Turner was adamant that APS had made every effort to sell the metal/rubber helix design and that there were no buyers other than Baker Hughes." Id.  In fact, however, "beginning in 2003, APS had sold a flexible coupling that included a metal/rubber helix design" (i.e., the APS Product) to other companies.  Id. at 4 ¶ 15.  Plaintiffs contend that these actions by Turner constitute a breach of the implied covenant of good faith and fair dealing.  See Third Am. Compl. at 15 ¶¶ 102-05 (Doc. No. 35).

Taking these facts and drawing all reasonable inferences flowing from them in favor of plaintiffs, as the court must at the summary judgment stage, a reasonable jury

could conclude, although it would not have to conclude, that Mr. Turner acted with a

dishonest purpose when he told Ide that there were no buyers for the metal/rubber helix

design while simultaneously developing and selling the APS Product to third parties.

Ide's Affidavit is evidence sufficient to create genuine disputes about issues of material

fact with respect to plaintiffs' claim of breach of the implied covenant of good faith and

fair dealing.  Summary judgment for defendants on this claim is inappropriate.

      C.    <u>Statute of Limitations</u>

Because the court concludes that defendants are not entitled to summary

judgment on the merits of plaintiffs' breach of contract and breach of the implied

covenant of good faith and fair dealing claims, the court must reach the question of

whether any of these claims are barred by the applicable statute of limitations.

      1.    Breach of Contract

The statute of limitations for contracts in Connecticut is set forth by section 52-

576 of the Connecticut General Statutes ("C.G.S.A.").  That section provides that

actions "on any simple or implied contract, or on any contract in writing" must be

brought "within six years after the right of action accrues."  C.G.S.A. § 52-576(a).  In

Connecticut, as in other jurisdictions, "in an action for breach of contract the cause of

action is complete at the time the breach of contract occurs, that is, when the injury has

been inflicted."  <u>Amoco Oil Co. v. Liberty Auto and Elec. Co.</u>, 262 Conn. 142, 153 (2002)

(internal quotations, alterations, and citation omitted).  Although Connecticut courts note

that "the application of this rule may result in occasional hardship, it is well established

that ignorance of the fact that damage has been done does not prevent the running of

the statute, except where there is something tantamount to a fraudulent concealment of

18

a cause of action." <u>Id.</u>  Furthermore, "the occurrence of an act or omission—whether it is a breach of contract or of duty—that causes a direct injury, however slight, may start the statute of limitations running against the right to maintain an action even if the plaintiff is not aware of the injury."  <u>Rosenfield v. I. David Marder and Associates, LLC</u>, 110 Conn. App. 679, 686 (2008).  For purposes of starting the running of the statute of limitations, "it is sufficient if nominal damages are recoverable for the breach or for the wrong, and where that is the case, it is unimportant that the actual or substantial damage is not discovered or does not occur until later."  <u>Id.</u>

As noted by the Connecticut courts quoted above, the application of a strict statute of limitations can produce hardship, so under certain circumstances Connecticut law provides some relief for plaintiffs who are delayed in bringing their actions to court. One of those circumstances is when a plaintiff alleges fraudulent concealment.  <u>See</u> <u>Amoco Oil Co.</u>, 262 Conn. at 153.  At oral argument, plaintiffs conceded that they have not pled fraudulent concealment and do not argue that there was fraudulent concealment in this case.

Another of those circumstances is when the plaintiff alleges a continuing course of conduct.  In effect, the continuing course of conduct doctrine tolls the statute of limitations such that "the statute does not begin to run until [the] course of conduct is completed."  <u>Stuart v. Snyder</u>, 125 Conn. App. 506, 510 (2010).  However, "the continuing course of conduct doctrine classically applies to torts," <u>see</u> <u>AT Engine Controls Ltd. v. Goodrich Pump & Engine Control Systems, Inc.</u>, No. 3:10-cv-01539 (JAM), 2014 WL 7270160 at * 14 (Dec. 18, 2014), and Connecticut law is unclear about whether the continuing course of conduct doctrine applies to cases, such as this one,

19

that sound in contract, see Saint Bernard School of Montville, Inc. v. Bank of America, 312 Conn. 811, 834 n.11 (2014) (stating that, "[a]lthough our Appellate Court has questioned the extent to which [the continuing course of conduct doctrine] applies outside of claims sounding in tort, we have no occasion to consider that question in the present case").

Although Connecticut law on this point is not settled, the traditional explanation for, and uses of, the continuing course of conduct doctrine counsel against the extension of the doctrine to cases, such as this one, that involve sophisticated parties who owed no duty to one another beyond the scope of their contractual relationship. Cf. Fradianni v. Protective Life Ins. Co., 145 Conn. App. 90, 96-101 (2013) (outlining the purpose and application of the continuing course of conduct doctrine). The court concludes that the Connecticut Supreme Court would not toll the statute of limitations in this contract case through application of the continuing course of conduct doctrine.

Because the continuing course of conduct doctrine is inapplicable to the present case, and because the plaintiffs have alleged no other grounds for tolling the statute of limitations, all that remains is for the court to apply the statute of limitations to plaintiffs' breach of contract action.

Defendants have offered two arguments as to why the statute of limitations bars any recovery by plaintiffs in this case. First, in their briefing, defendants contend that, even if the modified 1994 Agreement could be construed as a contract governing sales of the APS Product, the sale of the APS Product was a single breach of that contract. See Defs.' Mem. at 13 (Doc. No. 160-1). Under defendants' theory, the statute of limitations for plaintiffs' breach of contract action began to run the first time the APS

20

Product was sold,[12] and expired in 2009 (prior to the commencement of this lawsuit).
See id. If defendants' view of sales of the APS Product as a single breach is correct, each sale of the APS Product—including sales that occurred after 2009—merely served to increase the amount of damages that would be potentially recoverable by plaintiffs.

Second, and wholly separately, at oral argument defendants argued that the sale of the first APS Product constituted a repudiation of the modified 1994 Agreement, and that the statute of limitations began to run from the date of the repudiation.[13] As with defendants' first argument, the success of defendants' second argument would mean that the statute of limitations on plaintiffs' breach of contract claims expired in 2009, prior to the initiation of this lawsuit.[14]

_____

[12] The parties agree that sales of the APS Product began in 2003. See Pls.' L.R. 56(a)2 Stmt. at 8 ¶ 18 (Doc. No. 162-1).

[13] Defendants do not appear to have raised the argument that they repudiated the modified 1994 Agreement in any of their briefing. Although the court will consider this argument, the court notes that this is but one example of a troubling habit, which both parties have exhibited, to raise claims that have not previously been presented to the court when it is convenient to do so. At oral argument, the court gave the parties the opportunity to present any additional arguments that they did not feel had been adequately covered. The court expects that this means the court has been apprised of all the arguments that the parties wish to make in this case, in this court or elsewhere.

[14] In addition to arguing that the statute of limitations has run on plaintiffs' claims because defendants repudiated the 1994 Agreement, at oral argument defendants asserted that contracts of indefinite duration are terminable at will in Connecticut. Although defendants did not say so explicitly, such a contention could be part of a larger argument, which might be separate from the repudiation claim for statute of limitations purposes, that defendants terminated the modified 1994 Agreement prior to the first sale of the APS Product and therefore are not liable for damages under the contract stemming from those sales.
      However, defendants have neither alleged nor come forward with any evidence, nor made any argument about how and when defendants terminated or repudiated the modified 1994 Agreement. See Defs.' L.R. 56(a)1 Stmt. (Doc. No. 160-2); Defs.' Mem. (Doc. No. 160-1); Defs.' Reply (Doc. No. 166). At the summary judgment stage, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). To the extent that defendants' statements at oral argument were intended to suggest that defendants are not liable for damages resulting from sales of the APS Product because defendants terminated or repudiated the 1994 Agreement before those sales took place, defendants have failed to carry their burden of establishing that there are no genuine issues of material fact in dispute and that they are entitled to judgment as a matter of law on these grounds.

In response, plaintiffs argue that defendants did not repudiate the modified 1994 Agreement, and that each sale of the APS Product was a separate breach of that contract that triggered a separate statute of limitations.  If plaintiffs are correct that each sale of the APS Product was a separate breach of the agreement between the parties, they would be able to recover damages for any sales of the APS Product[15] that took place no more than six years prior to the initiation of this lawsuit (i.e., APS Product sales that took place after November 7, 2005).  Plaintiffs would not be able to recover damages for sales that occurred prior to November 7, 2005.

As with defendants' arguments on the merits of plaintiffs' claims, the court will consider each of defendants' statute of limitations arguments separately and in turn.

a.      Repudiation

Under Connecticut law, repudiation of a contract "can occur either by a statement that the promisor will not perform or by a voluntary, affirmative act that indicates inability, or apparent inability, substantially to perform."  Gilman v. Pedersen, 182 Conn. 582, 584 (1981).  "For a repudiation to have legal effect, the threatened breach must be . . . serious enough that the injured party could treat it as total if it occurred."  Roessler v. New England Glass Enclosures Inc., No. CV 90 0108712, 1993 WL 7537 at *5 (Conn. Super. Ct. Jan. 7, 1993) (internal quotations and citation omitted).  Where, as here, the parties have not produced evidence that the alleged repudiation was unambiguous and in writing, whether a contract was repudiated by the parties is a question of fact.  Cf. DiFolco v. MSNBC Cable LLC, 622 F.3d 104, 112 (2d Cir. 2010) (noting that under New

---

[15] At oral argument, plaintiffs conceded that, following the Second Circuit's affirmance of the court's grant of summary judgment for defendants on several of plaintiffs' claims, see RIDE, 612 Fed. Appx. at 35, plaintiffs no longer have a claim for damages related to sales of the RIDE Product.

York law, "the issue of repudiation or abandonment is an issue of fact" (internal quotations, alteration, and citation omitted)); <u>Powell v. Spot-On Networks, LLC</u>, No. Civ. 304CV92 (RNC), 2006 WL 860108 at *3 (D. Conn. Mar. 31, 2006) (suggesting that whether a defendant repudiated a contract through a verbal manifestation of intent not to perform is a question for a jury).

Because the question of whether the modified 1994 Agreement was repudiated involves a genuine dispute about an issue of material fact, the court cannot grant summary judgment for the defendants on statute of limitations grounds pursuant to their theory that the modified 1994 Agreement was repudiated. However, this denial of summary judgment is without prejudice to defendants raising this statute of limitations issue at trial.

b.      Sale of the APS Product as Breach of Contract

Defendants also argue that the statute of limitations has run on plaintiffs' breach of contract claim because sales of the APS Product constituted a single breach of the modified 1994 Agreement. <u>See</u> Defs.' Mem. at 13 (Doc. No. 160-1). In contrast, plaintiffs construe each sale of the APS Product as a separate breach of the 1994 Agreement. <u>See</u> Pls.' Opp. at 16 (Doc. No. 162). Whether sales of the APS Product were a single breach or repetitive breaches of the same kind is an extremely close question. On the basis of the record presently before the court, and mindful of the fact that the court must resolve ambiguities and draw inferences in favor of the non-moving party at the summary judgment stage, <u>see</u> <u>White</u>, 221 F.3d at 300, the court's judgment is that there is a material issue of fact as to whether each sale of the APS Product was a separately actionable breach of the modified 1994 Agreement. Thus, the statute of

limitations for breach of contract actions under Connecticut law, on this record, does not bar plaintiffs' recovery for damages sustained from sales of the APS Product that occurred no more than six years prior to the commencement of this lawsuit.

"There are contracts . . . that have been said to require continuing (or continuous) performance for some specified period of time, a period that may be definite or indefinite when the contract is made.  These contracts . . . are capable of a series of 'partial' breaches, as well as of a single total breach . . . ."  10-53 Corbin on Contracts § 53.14 (2015); cf. Guilbert v. Gardner, 480 F.3d 140, 150 (2d Cir. 2007) (noting that under New York law, if a contract "requires continuing performance over a period of time, each successive breach may begin the statute of limitations running anew").  In other words, a contract that requires continuing performance can be susceptible to repeated, partial breaches that trigger the running of independent statutes of limitations.  See Fradianni, 145 Conn. App. at 102-03.  At the same time, Connecticut courts recognize that not all damage associated with a single breach may occur at the time of the breach and, in situations where damages associated with a single breach accrue at various times, the statute of limitations for maintaining a cause of action will begin to run from the moment of "the occurrence of an act or omission—whether it is a breach of contract or of duty— that causes a direct injury, however, slight."  Rosenfield, 110 Conn. App. at 686.  When such an act or occurrence takes place, "it is sufficient if nominal damages are recoverable for the breach or for the wrong, and where that is the case, it is unimportant that the actual or substantial damage is not discovered or does not occur until later."  Id.

Whether repeated actions should be construed as part of a single breach of contract or as separate breaches of contract depends on the nature of the contract and

the facts associated with the breach.  For example, an installment contract that requires repeated performance on a set schedule readily lends itself to the conclusion that each imperfect performance should be a separately actionable breach.  See, e.g., Fradianni, 145 Conn. App. at 102-03 & 103 n.12 (finding that each annual calculation of the cost of insurance could constitute a separate breach of an insurance contract).  In contrast, contracts that involve more generalized, ongoing obligations may make it "wholly impracticable to separately compute damages" for each action that allegedly breached the duties imposed by the contract; in these cases, each later occurrence is "merely more evidence of the original breach but not a new, distinct breach."  Pinnacle Pizza Co. v. Little Caesar Enterprises, Inc., 598 F.3d 970, 978 (8th Cir. 2010).

Sales of the APS Product share characteristics with both of these examples, which makes the appropriate characterization of defendants' actions that allegedly breached the modified 1994 Agreement a very difficult question.  However, based on the record that is currently before the court, the court concludes that, if the jury finds that defendants breached the modified 1994 Agreement when they sold the APS Product and failed to split profits from those sales with plaintiffs (which, on this record, a reasonable jury could find), each sale of the APS Product would be a separate breach. As a result, a material issue of fact exists as to whether plaintiffs could recover for sales of the APS Product that took place no more than six years prior to the initiation of this lawsuit.  Thus, summary judgment for defendants on these grounds is inappropriate.[16]

---

[16] The court is open to revisiting this determination after a fuller record has been presented at trial.

2.      Breach of the Implied Covenant of Good Faith and Fair Dealing

The analysis of whether plaintiffs' claims of breach of the implied covenant of

good faith and fair dealing are timely is nearly identical to the analysis of whether

plaintiffs' breach of contract claims are timely.[17]  Plaintiffs' claim that the implied

covenant of good faith and fair dealing was breached by defendants sounds in contract.

See Third Am. Compl. at 15 (Doc. No. 35).  In their briefing, the parties agree that

because claims of breach of the implied covenant of good faith and fair dealing sound in

contract, these claims are like contract claims in the sense that they accrue when the

breach occurs.  See Pls.' Opp. at 17 (Doc. No. 162); Defs.' Mem. at 11 (Doc. No. 160-

1).  Under Connecticut law, the statute of limitations for such claims is six years.  See

C.G.S.A. § 52-576; Bellemare v. Wachovia Mortg. Corp., 94 Conn. App. 593, 610

(2006) (noting that a claim for breach of the implied covenant of good faith and fair

dealing is subject to the six-year statute of limitations of section 52-576 of the

Connecticut General Statutes).

The implied covenant of good faith and fair dealing is also like other, express

contract terms in the sense that the implied covenant can be subject to multiple

breaches during a course of dealing between two parties.  See, e.g., Russell v. Citicorp

Life Ins. Co., No. CV 940540013S, 1997 WL 781971 at *1 n.1 & *7 (Conn. Super. Ct.

Dec. 4, 1997) (noting that a plaintiff's complaint against a defendant alleged multiple

"breaches of the implied covenant of good faith and fair dealing").  This similarity means

that the central question for assessing the timeliness of plaintiffs' claims of breach of the

---

[17] At oral argument, both parties asserted that the statute of limitations analysis for plaintiffs'
breach of implied covenant of good faith and fair dealing claims is identical to the analysis for plaintiffs'
breach of contract claims.

implied covenant of good faith and fair dealing is the same as the question for plaintiffs' breach of contract claims.  For both kinds of breaches, the key question is whether each action by the defendants constituted an independent breach that triggered a separate statute of limitations.

Given the similarity between the evidence and alleged facts supporting plaintiffs' breach of contract and breach of the implied covenant of good faith and fair dealing claims, the court can discern no reason the alleged breaches of the implied covenant of good faith and fair dealing should be treated differently than the alleged breaches of contract in this case.  Each of Turner's statements that plaintiffs allege was made in bad faith is separable from Turner's other statements, made at other times, in the same manner that each sale of the APS Product is potentially a separate breach of the modified 1994 Agreement.  Therefore, the court concludes that every statement made by Turner in bad faith that constituted a violation of the implied covenant of good faith and fair dealing triggered the running of a separate statute of limitations.[18]  Because plaintiffs allege that Turner made such statements throughout the period in which the parties sold the RIDE Product to Baker Hughes—and have offered supporting evidence in the form of an Affidavit from Ide that attests to those facts—some of plaintiffs' claims could be timely.  See Ide Aff. at 4 ¶ 14 (Doc. No. 179).  Thus, there are material issues of fact and defendants are therefore not entitled to summary judgment for these claims on statute of limitations grounds.

---

[18] As with the breach of contract claims, however, the court notes that this is an extremely close question, and the court is open to revisiting this decision at trial on a more fully developed record.

**V.      CONCLUSION**

For the reasons set forth above, the court **DENIES** defendants' Second Motion

for Summary Judgment (Doc. Nos. 160 and 161).

**SO ORDERED.**

Dated this 30th day of December, 2015 at New Haven, Connecticut.


                              _/s/ Janet C. Hall_____
                              Janet C. Hall
                              United States District Judge